Alfred P. FRANCI, Robert H. Graff, Sr., and Mabel Foster, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

AVCO CORPORATION, AVCO LYCOMING DIVISION, Defendant.

Civ. No. B–77–22.

United States District Court, D. Connecticut.

April 23, 1982.

Beverly J. Hodgson, Michael Koskoff, Koskoff, Koskoff & Bieder, P. C., Bridgeport, Conn., for plaintiffs.

Richard J. Shapiro, Burton M. Weinstein, Bridgeport, Conn., for Donald Kuntz and Bernard Holsera.

Eileen B. Donahue, Edward J. Donahue, Derby, Conn., for Rudolph J. Tamburino.

Paul Lewis Otzel, Kapusta & Otzel, Milford, Conn., for Peter Penkala.

Donald W. O'Brien, James M. Tanski, Bradford H. Buck, Harold V. Gormon, Hartford, Conn., for Anthony S. Cianciolo.

Edward Maum Sheehy, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., Don A. Banta, J. Kevin Hennessy, William T. Coleman, Naphin, Banta & Cox, Chicago, Ill., for defendant.

## MEMORANDUM OF DECISION

DALY, District Judge.

This lawsuit under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, ("ADEA"), states claims of one hundred twenty-six plaintiffs, former employees of Avco Corporation, the Avco Lycoming Division in Stratford, Connecticut, of age discrimination. Plaintiffs allege that in 1974, 1975 and 1976 the Avco Lycoming Division laid off many employees, and in doing so used age as a criterion for selecting them for lay off. The massive reduction in force, concentrated in 1974 and 1975, was a business necessity, a measure to stave off fiscal ill-health at Avco Lycoming, but it was executed in a manner, plaintiffs allege, which made their ages above forty years a liability.

Named plaintiffs Alfred Franci, Robert Graff and Mabel Foster sue on their own behalf, and on behalf of 75 others who were laid off.[1] A second class of 48 plaintiff members allege that they were not recalled from lay off to job openings because of

---

1. Seventy-seven of the plaintiffs with layoff claims were represented by one law firm, and their names are listed on pp. 5–7 of plaintiffs' Proposed Findings of Fact and Conclusions of Law. The seventy-eighth, Peter Penkala, retained other counsel.

their age once Avco Lycoming began replenishing its work force.[2]

This memorandum of decision follows a full trial on the merits of the question of liability, the trial having been bifurcated by Court order. The Court reserves decision on the question of damages to be awarded these plaintiffs who have successfully proven their claims of discrimination.

I. Equitable Tolling of Notice Requirement

After being laid off in February 1975, plaintiff Graff filed a complaint with the United States Department of Labor alleging that he and others had been selected for layoff because of their ages. That complaint was filed April 11, 1975 (Ex. 2). In October 1976, more than 300 days after the allegedly improper layoff, he notified the Department of Labor of his intent to sue under the ADEA (Ex. 3), and filed a complaint with the Connecticut Commission on Human Rights and Opportunities, ("CCHRO"), (Ex. 4). Co-plaintiff Franci was laid off in April 1975, and in September filed a complaint with the CCHRO (Ex. 6). Counsel informed the CCHRO that the allegations of age discrimination in Mr. Franci's complaint were on behalf of Mr. Graff and others, as well as Mr. Franci (Ex. 5).

The Department of Labor attempted to conciliate plaintiff's complaint, but after four months, in January 1977, terminated its unsuccessful efforts (Tr. 80). This lawsuit was commenced January 14, 1977.

■ Prior to 1978 a plaintiff bringing suit under the ADEA was required to have notified the Secretary of Labor of his intent to sue at least sixty days prior to filing his complaint. In a state like Connecticut which has its own administrative agency to receive age discrimination complaints the filing with the Secretary could be no later than 300 days after the alleged discrimination occurred. 29 U.S.C. § 626(d) (1967) (amended 1978). Congress amended § 626(d) in 1978 to require the filing of a

charge, rather than an intent to sue notice, within the same time period. Despite some spurious case law to the contrary, § 626(d), as amended, is in the nature of a statute of limitations. A plaintiff's failure to comply with its provisions does not deprive the Court of subject matter jurisdiction, although noncompliance may create a procedural bar to plaintiff's claim. Because it is similar to a statute of limitations, § 626(d) is subject to equitable modification. *Zipes v. Trans World Airlines, Inc.*, —— U.S. ——, —— n.11, 102 S.Ct. 1127, 1133 n.11, 71 L.Ed.2d 234 (1982), quoting House Conference Report No. 950, 95th Cong., 2d Sess., at 12.

.Of critical importance to this case is the Court's belief that the 1978 amendment of § 626(d) did not change the character of that statutory section. As explained in the Ruling on Motion for Summary Judgment (September 26, 1978) Congress' intent as to the pre-1978 version of § 626(d) is unclear, but the better view is that that section was, like the amended version, a limitations provision subject to equitable modification. There is nothing about the 1978 amendment, which was essentially a linguistic change, that suggests the 95th Congress' remarks about the amended section are not equally applicable to the earlier version. Because there is no Second Circuit or Supreme Court case definitively characterizing the earlier version of § 626(d) as either a jurisdictional prerequisite or as a statute of limitations, the Court adheres to its view, already announced in the September 26, 1978 Ruling, that it is a limitations provision.

The Supreme Court has intimated that it would agree with that view. In *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979), the Court referred to the filing requirements of § 626(d), and noted that they were adequate protection against stale claims. 441 U.S. at 762–3, 99 S.Ct. at 2074–75. Because protecting against stale claims and insuring

**2.** Forty-five of them, named on pp. 18–19 of Plaintiffs' Proposed Findings of Fact and Conclusions of Law, were represented by one law firm, and three others, Donald Kuntz, Rudolph Tamburino and Anthony Cianciolo, had separate counsel.

some measure of repose are traditional earmarks of a limitations statute, the Supreme Court's reference to § 626(d) appears to characterize it as such. The holding in *Zipes v. Trans World Airlines, supra,* is also consistent with this result. There the Court construed a comparable provision of Title VII, 42 U.S.C. § 2000e–5(e), and held that the timely filing of a charge with the EEOC is not a jurisdictional prerequisite to suit, but rather a requirement subject to equitable modification. The Court noted that "[a]lthough our cases contain scattered references to the timely filing requirement as jurisdictional, the legal character of the requirement was not at issue in those cases". —— U.S. at ——, 102 S.Ct. at 1133. So, too, with § 626(d): among a few scattered references to it as a jurisdictional hurdle, there is no authority, binding on this Court, which directly considered its legal character.[3] The Supreme Court's decision in *Zipes* that a timely filed EEOC charge is not a jurisdictional prerequisite to a Title VII suit honors the "remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer". —— U.S. at ——, 102 S.Ct. at 1133. Similarly, this Court's decision of September 26, 1978 that § 626(d) was not, and is not, of jurisdictional character comports with the remedial purpose of the ADEA.

■ Contrary to defendant's view, the facts of this case are appropriately suited to a finding of equitable tolling. After layoff in January 1975, plaintiff Robert Graff hoped to be recalled to a job opening. His hopes were, in part, encouraged by defendant's actions. William Finn, Director of Procurement, selected Mr. Graff for layoff because of a general cutback (Tr. 34), even though plaintiff's performance on the job had not been criticized (Tr. 80–1). In the numerous conversations Mr. Graff thereafter had with Mr. Finn, he was told that Mr. Finn was trying to hire personnel, and that, if he were able, he would recall Mr. Graff

before any others (Tr. 41). No literal promise of recall was made, but the encouraging possibility of recall was indeed dangled before Mr. Graff. He should not be expected to have jeopardized his chances of recall by filing a complaint against his former employer as long as his expectation of recall, fueled by defendant's actions, was reasonable. *See* Ruling of September 26, 1978 at 12.

Defendant claims to find itself prejudiced by this lawsuit because it did not receive notice of Mr. Graff's intent to sue until October, 1976, ten months after the end of the 300 day filing period provided for by § 626(d). However, its claims of prejudice are like the complaints of a hypochondriac: they are designed to attract attention, but are based on only imaginary ailments. Defendant has pointed to no specific instance of prejudice. It has stated the truism that it is virtually impossible to reconstruct all of the events surrounding the lay off of each particular plaintiff (Defendant's Post-trial Brief at 9) without explaining why the task was made any more difficult by not receiving Mr. Graff's intent to sue notice until 1976, instead of in 1975. Furthermore, Pasquale Cipriano, Manager of Professional Relations and Equal Employment Opportunity, knew in 1975 that complaints of age discrimination had been filed in April of that year (Tr. 74), but he took no steps to analyze or preserve information for that year which might have helped in reconstructing pertinent events (Tr. 74). Even for the years 1977 and 1978, after the lawsuit had been filed, defendant adhered to its policy of reusing computer tapes containing personnel information, and thereby erasing information already on them (Tr. 83).

These two factors, good faith reliance on the possibility of being recalled and lack of prejudice, are critical to the tolling of § 626(d)'s 300 day filing period. Moreover, tolling does not defeat the objectives of that statutory section. The Department of

---

**3.** *Reich v. Dow Badische Co.,* 575 F.2d 363 (2nd Cir. 1978) is not to the contrary. The Second Circuit there simply held that § 626(d)'s terms implied that a notice of intent to sue should be written rather than oral. 575 F.2d at 368. Nothing in the facts there present entitled plaintiff to be excused from failing to comply with § 626(d). 375 F.2d at 369.

Labor had ample opportunity to attempt conciliation of the claims. Indeed, conciliation took place from October, 1976 to January, 1977 (Tr. 80). Moreover, defendant had notice of an age discrimination claim within the 300 day period, according to Mr. Cipriano's testimony. On these facts, the Court determines that 29 U.S.C. § 626(d)'s requirements were tolled.

■ Because plaintiff Graff's commencement of his lawsuit was therefore timely, and because he, as a named plaintiff, represents other plaintiffs, he may bring a representative action on behalf of others who may not have followed the administrative routes at all. *Oscar Mayer v. Evans*, 441 U.S. at 758, n.6, 99 S.Ct. at 2072 n.6, citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) at 414, n.8, 95 S.Ct. 2362 at 2370 n.8, 45 L.Ed.2d 280.

II. Plaintiffs' Lay-off Claims

A. The Prima Facie Case

■ An age discrimination case is, in many ways, like a claim of racial discrimination under Title VII. The elements of a plaintiff's prima facie case under the ADEA are similar to, and indeed adapted from, Title VII cases such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The very language of the ADEA's substantive provisions, derived *in haec verba* from Title VII, warrants the adaptation of Title VII case law to analogous, yet distinct, claims of age discrimination. *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

The Title VII cases upon which courts have drawn in analyzing ADEA claims have been, for the most part, cases involving discriminatory hiring practices. For instance, in *McDonnell Douglas*, the plaintiff's prima facie case consisted of proof that he was a member of a minority group, that he was qualified for the open position

for which he had applied and had been rejected, and that the position remained open after his rejection. According to *Griggs*, a Title VII plaintiff may establish his prima facie case by showing that a hiring practice, neutral on its face, has a disparate impact on minority applicants. When *Griggs* was adapted to a claim of age discrimination in hiring in *Geller v. Markham*, 635 F.2d 1027 (2nd Cir. 1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981), a policy of hiring teachers with low and intermediate levels of experience, and paying them commensurately, was held to discriminate against more highly paid and experienced, and older, teachers. The plaintiff there established a prima facie case of disparate impact by showing, through statistical evidence which proved the correlation between age and experience, that the facially neutral hiring policy had a disproportionate impact on her as a member of the class of older persons protected by the ADEA.[4]

Because a reduction in work force, such as that which occurred at the Avco plant in 1974–6, presents factual circumstances wholly distinct from a case involving hiring practices, the *Geller* court's thorough discussion of the elements of a prima facie case of age discrimination can not readily be applied to this case. Other Second Circuit cases involving reductions in force offer slight guidance as to how a plaintiff in such a case may prove age discrimination. *Parcinski v. The Outlet Company*, 673 F.2d 34 (2nd Cir. 1982), involved a reduction of an employer's work force, but the Second Circuit focused its attention on the need for a plaintiff to prove that age was a "causative or determining factor", at 36, without analyzing the other elements necessary to prove the claim. In *Bentley v. Stromberg-Carlson Corp.*, 638 F.2d 9 (2nd Cir. 1981), also a reduction in work force case, the Second Circuit found that, on the specific facts before it, the plaintiff had established a prima facie case, but it did not generalize its discussion so that it could serve as prece-

---

**4.** Plaintiff Geller also proved a prima facie case of discriminatory treatment according to the McDonnell Douglas standard, but the trial court did not instruct the jury on the specific elements of that theory. *Geller v. Markham*, 635 F.2d at 1034, n.3.

dent for other plaintiffs with factually similar, yet distinct, claims.

The most exhaustive analysis of which this Court is aware of the prima facie elements in a reduction in force case was undertaken by the Fifth Circuit in *Williams v. General Motors*, 656 F.2d 120 (5th Cir. 1981), *cert. denied* —— U.S. ——, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982), cited with approval by the Second Circuit in *Parcinski*, at 37. The Fifth Circuit started its analysis with *McDonnell Douglas*, but modified it to fit the particular circumstances of the case before it, concluding that the prima facie elements a plaintiff must prove in a reduction in force case, at least in the Fifth Circuit, are that he was within the protected age group and was either discharged or demoted, that he was qualified to assume another position, and that defendant had intended to discriminate on the basis of age. In other words, as to the last element, direct or circumstantial evidence must lead a reasonable factfinder to conclude either (1) that defendant consciously refused to consider retaining or relocating plaintiff because of his age, or (2) defendant regarded age as a negative factor in such consideration. 656 F.2d at 129–130.

■ Statistical evidence may be used as circumstantial proof that discrimination occurred, such as where, as in *Geller*, an apparently neutral policy of rejecting the most highly paid teachers had a massive impact on older teachers who were, generally, more experienced and more highly paid than younger teachers.

Because the Second Circuit has cited *Williams* with approval, and because it is harmonious with the Second Circuit's own views of age discrimination claims, this Court may rely on it as persuasive authority in evaluating the claims of plaintiff Franci and his co-plaintiffs.

■ Of course, a plaintiff's prima facie case is merely the starting point. It denotes the establishment of a legally mandatory, rebuttable presumption that defendant impermissibly discriminated against plaintiff because of age. Once the prima facie elements have been established, defendant may rebut the presumption of discrimination by producing evidence of its own. The factual issue is thereby placed in dispute. Once the dispute is raised, the burden of producing evidence, either by new testimony or by discrediting defendant's evidence through cross-examination, shifts back to plaintiff. Throughout the case, plaintiff retains the burden of persuasion, and when the burden of production returns to him, it merges with the ultimate requirement that he persuade the trier of fact that he has proved impermissible discrimination. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–4, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981).

■ Turning to the facts of this case, plaintiffs' prima facie case consists of evidence that they were, at the time of lay off, within the age group protected by the ADEA. Each was performing his job satisfactorily at the time of lay off, and none was laid off for cause. Also, defendant continued to employ younger persons to perform duties for which a plaintiff was qualified (Ex. 61, Requests for Admissions, either admitted by defendant or deemed admitted by Court Order of June 25, 1981). By this evidence, plaintiffs proved the first two elements necessary to sustain their initial burden. Evidence establishing the third requisite element, defendants' intentional discrimination, is more diffuse throughout the record than the foregoing admissions, but no less compelling.

Direct evidence of intent is not always available to plaintiffs in a discrimination case, but in this case it was available, to a remarkable degree. Top management officials had admitted that the defendant company had set a goal of getting rid of some of the older employees, and that the layoffs presented a fortuitous occasion for reducing the ranks of older persons. William Finn, Director of Procurement, dictated to his secretary and sent to other managers along with the department budget a memorandum stating his opinion that the Procurement Department was overloaded with el-

derly people, and that younger people should be brought in. (Testimony of Mabel Foster, Tr. 397, 401). Anthony Fusco, Manager of Experimental Material Control, said he had been put in his job to get rid of some of the older people who had been there "too long". (Testimony of Joseph Bennett, Tr. 332, 336, 337); (Testimony of Burton Sjodin, Tr. 366–7); (Testimony of Robert F. Kupec, Tr. 1155–6, 1158); (Testimony of John Trapp, Tr. 1202, 1204, 1206). Howard Shanley, Supervisor of the Material Review Department, also told some employees that there would be a layoff consisting of older employees. (Testimony of Harry Sussman, Tr. 405–6, 412). John Arnold, Director of Industrial Relations, even warned one plaintiff that a layoff affecting older employees would occur soon (Testimony of Kenneth L. Stebbins, Tr. 321, 328), as did Walter Guden, Manager of Special Projects (Testimony of George W. Crossman, Tr. 1211–2).

These statements of the several managers were not merely expressions of personal opinion or unfounded speculation. They reveal a wide-spread knowledge among management personnel that a layoff was imminent, and that it would be used to eliminate certain older employees, and not simply to reduce the number of employees for economic reasons. Because a layoff was a corporate action within their knowledge (for, indeed, those managers were among those responsible for choosing the employees within their respective departments to be laid off), the managers were acting within the scope of their employment when they made those statements, and, therefore, their statements are admissions of defendant Avco Lycoming. Even Mr. Finn's memorandum expressing his opinion is an admission by defendant because the ensuing layoff manifested defendants' adoption of it. *See* Fed.R.Ev. 801(d)(2)(C) and (D).

In addition to the foregoing direct evidence, unequivocal in its import, plaintiffs offered circumstantial evidence of intentional discrimination. Defendant's overriding criterion for selecting employees to be laid off was the saving of money, and that sole factor allowed defendant's managers nearly untrammelled discretion in achieving the corporate goal of getting rid of older employees. Joseph Bartos, defendant's General Manager from 1974 to 1980, decided to reduce the work force in August 1974 and again in February 1975. His goal of reducing costs, of bringing them in line with revenues from the company's contract obligations, mandated the layoffs (Tr. 677–9). As he explained, reducing salaries was the foremost objective of the layoffs.

A: It was driven by costs. In my office we dealt with costs, dollars and cents . . . In our execution of the layoff, what you call layoff, each vice-president got a dollar consent budget sheet.

Q: Was this a budget they had to spend or was this a budget that he had to cut?

A: It starts with a budget he has to spend for the following year. That, minus his current cost rate, is his cut. It includes, again, people and all the other functions of expense of plant.

Q: Was each vice-president assigned an amount to _ _ _that had to be removed from the payroll?

A: The vice-presidents were . . . The vice-presidents got the costs that they had to get out (Tr. 680–1).

Apart from costs of salaries, Mr. Bartos gave the vice-presidents no written criteria for selecting employees. (Tr. 109, 607–8). He testified that the corporate policy of "[a]bsolutely no age discrimination" was explained to the vice-presidents (Tr. 683), but that the only tool used to monitor that avowed policy was a yearly report from the Industrial Relations department on the average age of the entire division's employees (Tr. 694–5).[5]

Some of the managers who actually decided which individuals were to be laid off used their own criteria, without any apparent oversight from Mr. Bartos or the vice-presidents. Some regarded length of company or department service as a positive

---

5. The average age and years of service of the non-bargaining unit work force declined in 1977, 1978 and 1979, the years for which figures were available (Ex. 101).

factor (Tr. 740); others gave it no weight (Tr. 788). The personnel department believed that vague standards, variously articulated as "capability, hireability and employability" or as "performance, versatility and service", were applied (Tr. 109–110). Notwithstanding official explanations of how selections were made, managers were practically autonomous in their selections, for often they did not inform their vice-presidents or the personnel department of their rationale, or at least they did not until defendant was preparing for this trial.

Q: [BY Mr. Koskoff] Did you ever tell Mr. Cipriano?

A: [BY Mr. Gudaitis] I believe, basically, on__when we put the requisition through reduction in force and then they would call the rationale, and we left it up to the Personnel Department to take the other actions, the reason rationale.

Q: Did Mr. Cipriano then call you at some point and ask why you chose [a plaintiff] for layoff?

A: No.

Q: Did he ever ask you that question?

A: No.

Q: Did you ever tell him on your own, just go and volunteer it?

A: No...

Q: Do you have any way of knowing how in August of 1980 an interrogatory could have been answered?

A: No (Tr. 751).

The common thread among the different managers' explanations of their lay off selections was the target of reducing expenses, as Mr. Bartos had instructed them.

Q: [BY Mr. Koskoff] So, if there's a dollar goal to achieve is that right?

A: [BY Mr. Barbuschak] An ultimate goal, yes.

Q: And you had to add up the employees that you were laying off to see whether you were achieving your dollar goal, didn't you?

A: Right.

Q: And so the amount that they were earning became an important consideration for you to see whether you were going to be able to meet your goal?

A: Oh, yes, yes (Tr. 880).

Obviously, the problem which defendant should have anticipated was that by giving area vice-presidents dollar amounts to cut from their budgets, and by focusing on salaries and fringe benefits as the budget items to cut (Tr. 111–116), defendant encouraged the layoff of highly paid, experienced, and thus older, employees. The correlation between experience and membership in the protected age group rendered discriminatory what were professed to be neutral reductions in salary expenses. In the Procurement Department, for instance, there were seven employees in February, 1975. The three most highly paid and experienced, and oldest, were laid off (Ex. 102). Of the four retained, three earned less than $1000 per month, and each of them had only a few years of service with the company, whereas of the three laid off, all had earned over $1100 monthly, and all had been with the company for more than 15 years.[6]

Finally, Pasquale Cipriano, now Manager of Professional Relations and Equal Employment Opportunity, perceived some "civil rights problems" at Avco. Indeed, he had sought a promotion to director status in 1979, after the commencement of this lawsuit, so that he could continue to have "a comfortable frame of mind in [his] involvement with all of [defendant's] Civil Rights problems" (Ex. 106(b)). At the time of trial, Mr. Cipriano had recently received two new job titles (Tr. 47–8), though neither was that of director.

The foregoing circumstantial evidence reinforces direct proof of intentional discrimination. With this evidence plaintiffs completed their prima facie case of disparate treatment in layoff, along the lines of *McDonnell Douglas, Williams* and *Parcinski.* Plaintiffs also established a prima facie case of disparate impact with statistical evidence.

6. Three other buyers had been laid off in August, 1974, all of them over fifty. None of the management trainees, aged 25, 28 and 33, were laid off in August or in February (Ex. 102).

Plaintiffs' expert witness tested employment and layoff statistics against the hypothesis that employees had been selected for layoff through the end of 1974 without regard for age. The group which Dr. Nancy Garvey considered did not include "confidential employees", because almost none of them had been subjected to layoffs. Only one of the one hundred eighty-five employees laid off in August 1974 was of confidential status (Tr. 1056). Dr. Garvey also excluded employees who had been with the company for two years or less, in reliance on defendant's testimony that seniority was a factor in favor of an employee's retention (Tr. 110). Then, comparing employees within the protected age group with those under 40, she found a correlation between employees of ages 45 years and older and selection for layoff. The statistical proof thus adduced showed that the facially neutral action of reducing the work force out of economic necessity had, through the end of 1974, a disparate impact on employees within the protected age group.[7]

## B. The Rebuttal Case

Once plaintiffs established their prima facie case, as described above, the burden of production shifted to defendant. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. Defendant attempted to meet their proof by offering contradictory evidence and cross-examining plaintiffs' witnesses. For instance, Mr. Finn denied he had ever dictated the memo Mrs. Foster remembered typing for him, the memo in which he stated that his department was overloaded with elderly people. Mr. Fusco denied telling certain employees that he was there to shake up the department and to bring in younger people, as did Mr. Shanley. However, their disavowals are not entirely credible when weighed against testimony of plaintiffs whom the Court found to be credible. Defendant's cross-examination of those plaintiffs who testified to their conversations with managers was not successful in discrediting them.

Defendant also advanced two theories in rebuttal—that layoffs were, in general, a business necessity, and that selections of individuals for layoff were made for specific reasons. As to the first theory, the Court is persuaded that a reduction in Avco's work force was necessary for economic reasons; even plaintiffs agree with that proposition. The ADEA does not preclude a business decision such as defendant's; it does preclude, however, using age as a criterion in realizing that legitimate business goal. Age is not to be a "determinative factor, one that [makes] a difference in deciding whether [plaintiffs] should be employed." *Geller v. Markham*, 635 F.2d at 1034. Therefore, in the face of evidence that age did make a difference, the protest that layoffs were an economic necessity is an utterly unresponsive defense.

The second line of rebuttal advanced by defendant, that the persons selected for layoff were less qualified than employees retained, or that their jobs were eliminated, deserves more serious consideration. The reasons testified to were several—that a plaintiff had not been performing well in his job at the time of layoff (Tr. 594, 633, 634, 742, 831, 884, 908, 910); that a plaintiff was not capable of assuming new responsibilities in a pared-down department (Tr. 631, 637, 729, 765, 786, 838) or that a whole group of employees, of which a plaintiff was a member, had been laid-off (Tr. 592, 637, 799, 800–03).

In most cases, the credibility of managers who testified at trial about plaintiffs' poor performances on the job was undermined by positive performance reviews and letters of recommendation more nearly contemporaneous with the layoffs (Tr. 962–6). Several of the witnesses who criticized plaintiffs' job performances had not been identified in pre-trial discovery as being responsible for layoff decisions, and their testimony at trial was different than answers previously

---

**7.** By the end of 1974, defendant's work force had been reduced to an essential core of personnel, and employees laid off thereafter were selected on an individual basis rather than on a larger-scaled group basis (Tr. 853).

ously given in discovery. Other witnesses had been asked their rationale only in preparation for trial, and not at the time of layoff. (See testimony quoted *supra* at 255). And some of the witnesses contradicted themselves under cross-examination (Tr. 832, 848).

The purported explanation that certain jobs had been eliminated must be evaluated in the context of evidence that, throughout the Avco plant, many job titles were changed, but job functions were continued (Tr. 889).[8] For example, the title "Manager Safety and Medical" was eliminated, and Kenneth Stebbins was laid off. However, his job duties were assumed by another person with the title "Supervisor Safety and Medical" (Ex. 105A). Many job functions were consolidated under a new title, and often a younger, relatively inexperienced employee took on more challenging responsibilities, instead of an older employee assuming the simpler functions (Tr. 388–9, Ex. 105A). Certainly, the streamlining of operations and consolidating of job functions are to be expected during a reduction in force, but those changes cannot become excuses for getting rid of older employees. It appears that the elimination and changes of job titles were a pretext for discrimination at Avco.

### C. Conclusion

As to 33 plaintiffs with layoff claims, defendant offered no rebuttal evidence. The absence of testimony as to them leaves undisputed the presumption of unlawful discrimination raised by plaintiffs' case. No fact having been placed in issue, the Court must enter judgment in their favor. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.[9]

The rebuttal evidence which was presented as to the other plaintiffs appears to be only a pretext for discrimination. Plaintiffs have carried their ultimate burden of persuasion, and are entitled to judgment.

### III. Plaintiffs' Recall Claims

### A. The Prima Facie Case

A second category of plaintiffs allege they were subjected to age discrimination when defendant failed to recall them from layoff. The proof shows that each was of an age protected by the ADEA and that each was qualified for a job opening at defendant's plant (Ex. 61). Of course, if Avco simply had reduced its work force and thereafter had no job openings, a discriminatory recall claim would be impossible to maintain. However, after shrinking the number of employees to a skeleton force, Avco began a build-up to meet new work orders in 1977, 1978 and 1979 (Tr. 145). During that recovery, defendant maintained a policy of considering employees on layoff for rehiring. In fact, the policy was so firm that a failure to recall an employee from layoff to an opening could not have been merely an oversight, but would have been a considered decision not to rehire him (Tr. 127–130). In order to attract new employees, defendant advertised jobs and recruited recent college graduates (Tr. 127, *et seq*). In at least one case, defendant even recruited applicants for an opening simultaneously with creating the opening by laying off a plaintiff from that position (Tr. 891).

Plaintiffs' claims that they were not recalled because of their ages appear to present a novel cause of action, for they have cited no case law recognizing that legal theory. However, *McDonnell Douglas* is amenable to adaptation to these facts. Using it as guidance in the circumstances of

---

8. This was shown to be true even though defendant had stated in answers to interrogatories that no one took on the exact job titles that the laid off employees had had (Ex. 105A).

9. These plaintiffs are: Ralph Armino, William Bodmer, William A. Bolevic, William T. Carey, Salvatore Chillemi, George W. Crossman, Andrew Dirgo, Robert Keane, Paul Kinney, Walter Kuzia, Romeo Landry, Katherine Lynch, Albert Majoris, George Niejelow, Robert Noel, Philip Rinaldini, Joseph Slosar, Kenneth Stebbins, Elizabeth Young, Robert Dawes, Louis Dermody, Armando DeVivo, Joseph Fekete, John Fritz, Vincent Hetes, John Lawrusko, Damon Loop, Theodosia Mester, Edward Murphy, Andrew Patrick, James Pierpont, Robert Sideleau and John Young.

an employer recalling employees from lay-off, a prima facie case would consist of proof that: 1) plaintiff was within the protected age bracket at the time a job became available; 2) plaintiff was qualified for the job; 3) plaintiff was not recalled, or was recalled only after a younger person was offered the job; and 4) the defendant employer took age into account in deciding whether or not, or when, to recall plaintiff.

By means of defendant's admissions, (Ex. 61), plaintiffs have proven the first three elements of their prima facie case. The Court also incorporates herein plaintiffs' Proposed Findings of Fact 30–39, at pp. 17–34. The direct and circumstantial evidence of intentional discrimination in lay-off, discussed *supra* in Part II, reveals defendant's intent to replenish its work force with younger employees. In sum, plaintiffs have established their prima facie case.

## B. The Rebuttal Case.

 Defendant offered no evidence to rebut the prima facie case of thirty plaintiffs with layoff claims. Those thirty prevail because there is no dispute on the evidence that defendant impermissibly discriminated. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.[10]

As to the eighteen others, defendant offered evidence either that there was some "contact for possible job offer" (Ex. 2008), or that defendant had some reason for not rehiring them (Tr. 93–4). The evidence that some plaintiffs were contacted about being recalled was far from conclusive; Mr. Cipriano was "fairly certain" that defendant had "initiated" those contacts (Tr. 1034–5), but there was no evidence that plaintiffs were actually reached by mail or telephone. If they were reached, the substance of any conversations is unknown. One of the plaintiffs, laid off but not rehired, had been hired "at the age of 49

anyway" (Tr. 94). Thus, the purported policy of recalling laid off employees to job openings appears not to have been followed when it would thwart the expressed goal of getting rid of older employees.

## C. Conclusion

The Court concludes that defendant's evidence in rebuttal does not successfully present non-discriminatory reasons for its failure to recall plaintiffs from layoff. The testimony that it contacted persons about jobs was vague and not well documented. Without some showing that plaintiffs actually were informed about job openings, the presumption established in the prima facie case that plaintiffs were not recalled because of their ages remains overriding. Upon the full record, plaintiffs have sustained their burden of persuading the Court that they were not recalled from layoff because of their age.

## IV. Willfulness of Defendant's Discrimination

The conclusion is inescapable that defendant willfully discriminated against employees of the ages protected by the ADEA. Managers revealed their intentions to get rid of older employees, and their largely unmonitored selection of the more highly paid employees for layoff was the means for realizing those intentions. That evidence has been thoroughly discussed above. Defendants discrimination occurred despite its knowledge of the ADEA's prohibitions (Tr. 58). Therefore, defendant acted intentionally, knowingly, and voluntarily, and is liable under 29 U.S.C. § 626(b) for its willful violation of the ADEA.

In accordance with the foregoing, judgment as to liability shall enter for plaintiffs.

It is SO ORDERED.

10. These plaintiffs are: Richard Auten, Arnold Breault, Arthur Brecht, Elmer Bull, Robert Byiteck, James Caputo, Sarah Coe, Charles Crescas, Eldridge Dorsey, Marvin Foxworth, Samuel Gaidosz, Gerald Gleit, John Hreschak, Alfred Janenda, Leonard Kaplan, William Karabinos, Karl Kuch, Stephen Lawruszko, Ralph Mahan, Lawrence Meriwether, Spero Mike, Harold Mitchell, Carl Pisacane, Oscar L. Rossi, Daniel Scelfo, Theodore Schebell, Frank Schepp, Charles Shaw, Edward Sutton and Andrew Valiska.