Miriam E. GELLER, Plaintiff–Appellant, Cross–Appellee,

v.

Walter MARKHAM et al., Defendants–Appellants, Cross–Appellees.

Docket Nos. 80–7087, 80–7089.

United States Court of Appeals, Second Circuit.

Argued Sept. 5, 1980.

Decided Dec. 8, 1980.

See also, D.C., 481 F.Supp. 835.

Elizabeth K. Spahn, Boston, Mass. (Gary J. Mena, Newton Center, Mass., of counsel), for plaintiff–appellant, cross–appellee.

Russell Lee Post, Jr., Avon, Conn. (O. Bradford Griffin, Jr., Avon, Conn., of counsel), for defendants–appellants, cross–appellees.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Miriam Geller, a 55–year–old teacher, brought a class action in the District Court for the District of Connecticut under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621, *et seq.*, claiming that defendants–appellants violated her rights by denying her employment as a teacher because of her age. She sought damages, equitable relief (including reinstatement, pension rights, benefits and seniority) and attorney's fees. A jury trial before Judge M. Joseph Blumenfeld resulted in an award of $15,190 damages. Following the trial, Judge Blumenfeld denied her application for equitable relief but awarded attorney's fees. From this denial she appeals. Defendants cross–appeal from the judgment against them, asserting that the court erred in its conclusions as to governing legal principles and in its instructions to the jury regarding causation.

We affirm the finding of defendants' liability, since the record reveals that defendants subjected Ms. Geller to a hiring practice with both discriminatory impact, see *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and illegally disparate treatment, see *McDonnell Douglas Co. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the principles of which may be applied in ADEA cases. See *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). We also affirm the district court's refusal to award reinstatement, but reverse its decision not to award pension benefits.

Ms. Geller applied for a position as a teacher at Bugbee School in West Hartford in late August, 1976. She was then 55 years old. She had gained considerable experience as a tenured teacher in New Jersey, where she had lived until shortly before applying for the Bugbee job, and she had done some work as a substitute teacher in the Connecticut schools. She was interviewed for a permanent position to fill a "sudden opening" in the Bugbee School on September 3, 1976, and was told to be ready to begin teaching art on September 7. Meanwhile, school officials continued to interview other candidates for the job.

Ms. Geller prepared the art room over Labor Day weekend, and taught school until September 17, when she was replaced by a 25-year-old woman who had not applied for the job until September 10. Shortly thereafter, Ms. Geller brought the present suit, alleging violations of ADEA, and pointing in particular to the "Sixth Step Policy" adopted by the West Hartford Board of Education ("Board"). This cost-cutting policy, which was derived from a statement included by the previous Bugbee School Superintendent in his budget report to the Board, read:

> "Except in special situations and to the extent possible, teachers needed in West Hartford next year will be recruited at levels below the sixth step of the salary schedule."

The sixth step is the salary grade reached by teachers with more than five years' experience.

At trial plaintiff introduced expert statistical testimony establishing that 92.6% of Connecticut teachers between 40 and 65 years old (the protected age group under ADEA) have more than 5 years experience, while only 62% of teachers under 40 have taught more than five years. She also presented considerable evidence in the form of witnesses' testimony that individual defendants had discussed the "sixth step" policy with her, and had taken the policy into account when deciding to replace her. Defendants countered that the ratio of hirees over 40 years of age to under-40 hirees had not changed substantially since the announcement of the "sixth step" policy. From these latter statistics, which were offered not by an expert statistician but by Mr. Hedrick, a named defendant, defendants argued that the "sixth step" policy had never been applied to discriminate on the basis of age. They claimed that Ms. Geller had been replaced by a younger woman because hiring officials considered the younger woman more qualified, not because the school board was unwilling to pay a woman with her experience. Defendants also argue that even if the "sixth step" was applied, they were justified in applying it because an "experience-cost criterion" for hiring was necessary in view of declining enrollments and rising school costs.

Largely on the strength of plaintiff's expert statistical evidence, Judge Blumenfeld found that defendants' "sixth step" policy was discriminatory as a matter of law. He found the case to be governed by the line of cases regulating facially neutral employment policies which have a discriminatory impact, see *Griggs v. Duke Power Co.*, *supra*; *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Washington v. Davis*, 426 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976). He declined to accept defendants' contention that proof of a violation of ADEA required establishment of discriminatory motive. With respect to plaintiff's claim of disparate treatment, see *McDonnell Douglas Co. v. Green, supra*, however, he took the view

that to sustain this claim plaintiff must ultimately prove a discriminatory motive on the defendants' part and that proof that they discharged her because of the application of the "sixth step" policy was insufficient, rendering *McDonnell Douglas* "inapplicable."

After instructing the jury that the "sixth step" policy was discriminatory on the basis of age as a matter of law, Judge Blumenfeld submitted to it the question of whether this policy had been applied to Ms. Geller. First, in his oral instructions to the jury, he asked it to determine "if the decision about Mrs. Geller was made in whole or in part, because she was above the fifth step," and if the "sixth step" policy "made a difference" in the decision to replace her with the younger woman, stating:

> "There could have been more than one reason for defendants' decision about [Mrs. Geller's] employment but she is nevertheless entitled to recover if one factor was her [age] and if it made a difference in determining whether she would be employed. If it did not make any difference, if it was not a reason that entered into the decision, then of course she has not proved her case. But if it did, then she has.
>
> "If defendants' decision about Mrs. Geller was made in whole or in part because she was above the fifth step on the salary scale, ... Mrs. Geller is entitled to recover...."

He then submitted special interrogatories to the jury, as follows:

> "THE COURT: I propose to submit some Special Interrogatories.
>
> 1. Was the sixth step guideline one reason for Mrs. Geller not being hired for the permanent art teacher's position at the Bugbee Elementary School? Answer: Yes or No.
>
> MR. POST: Sir, could I ask that that interrogatory track with your charge to the Jury and say, 'One reason that made a difference.'?
>
> THE COURT: No. If it was one reason, that is sufficient.
>
> MR. POST: That made a difference in their decision.

> THE COURT: No. If it was one reason."

The jury found for Ms. Geller, answering the first Special Interrogatory in the affirmative. It then responded to Judge Blumenfeld's charge to award "damages equal to the amount of losses plaintiff suffered due to defendants' discriminatory actions, less amounts earned through reasonable efforts at mitigation," by awarding $15,190 in back pay, which equalled the salary Ms. Geller would have earned at the Bugbee School in 1976. In answer to another interrogatory, the jury did not find that the defendants' discrimination was "willful."

In post-trial motions plaintiffs applied for equitable relief based upon the jury's verdict, specifically requesting reinstatement, pension benefits, and attorney's fees. All of these requests except for the request for attorney's fees were denied. Plaintiff has assigned as error the denial of these requests for relief, while defendants attack Judge Blumenfeld's instructions to the jury and his ruling that the "sixth step" policy was discriminatory as a matter of law.

## DISCUSSION

As the Supreme Court pointed out in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977), discriminatory or disparate treatment in violation of Title VII occurs where "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." "Disparate impact," on the other hand, results from the use of "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.*, 431 U.S. at 336 n.15, 97 S.Ct. at 1854. Proof of motive is not required to sustain a claim of disparate impact.

Defendants argue that principles with respect to discriminatory racist impact in violation of Title VII should not govern age discrimination cases instituted under 29 U.S.C. § 626(c)(1). We disagree. In *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978), the Court noted that "the [substantive] prohibitions of the ADEA were derived *in haec verba* from Title VII." Although the ADEA did not adopt Title VII's procedural rules entirely, the rule permitting a case to be established by a showing of discriminatory impact or treatment cannot reasonably be viewed as merely procedural. See *Oscar Mayer Co. v. Evans*, 441 U.S. 750, 755–56, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979).

### Disparate Impact

A prima facie case of discriminatory impact may be established by showing that an employer's facially neutral practice has a disparate impact upon members of plaintiff's class, in this case teachers over 40 years of age. *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1970). Such a discriminatory impact is frequently evidenced by statistics from which it may be inferred that an employer's selection methods or employment criteria result in employment of a larger share of one group (here, teachers under 40 years of age) than of another (teachers over 40). *Intl. Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 339, 97 S.Ct. 1843, 1854 n.15, 1856, 52 L.Ed.2d 396 (1977); *Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The employer may defend by showing that the employment practice is justified by business necessity or need and is related to successful performance of the job for which the practice is used, *Griggs v. Duke Power Co.*, supra, 401 U.S. at 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158. In that event the plaintiff must be given an opportunity to show that other selection methods having less discriminatory effects would serve the employer's legitimate interest in competent performance of the job. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir. 1971).

A prima facie case of discriminatory treatment may be made out by the plaintiff's showing:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 582, 98 S.Ct. 2943, 2952, 57 L.Ed.2d 957 (1978). The burden then shifts to the employer to go forward with evidence of "some legitimate, nondiscriminatory reason for the employee's rejection," *McDonnell Douglas Corp.*, supra, 411 U.S. at 802, 93 S.Ct. at 1824, in which event the plaintiff, who has the ultimate burden, must be afforded the opportunity to demonstrate by competent evidence that the employer's presumptively valid reasons are a cover–up or pretext. *Id.* at 805, 93 S.Ct. at 1825. If the plaintiff succeeds in this showing the employer's articulated reason will not stand. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

Turning to the present case, the plaintiff showed through an accredited expert (Dr. Alan Hunt), based on his statistical analysis of the relationship between age and years of experience for teachers in Connecticut, that 92.6% of all teachers over 40 years of age have five or more years of teaching experience, which he characterized as "very significant" statistically or about "600 times the level generally required for statistical significance." Although the significance of the 92.6% figure is somewhat weakened by evidence that over 60% of

teachers under 40 also have had more than five years experience, we agree with Judge Blumenfeld's finding that the high correlation between experience and membership in the protected age group (40 to 65 years of age) would render application of the "sixth step" policy discriminatory as a matter of law, see *Coates v. National Cash Register Co.*, 433 F.Supp. 655, 661 (W.D.Va.1977), since, absent countervailing statistics, the likelihood of a person over 40 being selected under the policy would be substantially less than that of a person under 40. The purpose of the "sixth step" policy was to economize by employing less experienced teachers, which would inevitably open more teaching opportunities to younger less experienced applicants than to the older, who were more experienced.

Defendants have offered two lines of defense, both of which are unpersuasive. First they contend that, although the "sixth step" policy appears to be correlated strongly to membership in the group over 40, the policy did not in fact result in discrimination against this group since the percentage of over-40 teachers hired to fill job openings before and after the application of the policy was about the same. The uncorroborated statistics offered in support of this contention, however, were so defective as to justify the district court's refusal to give them any weight. They were prepared by a named defendant in the case, a former Personnel Director for the West Hartford schools who had no expertise as a statistician and had a direct interest in the outcome of the case.[1] He not only failed to produce any competent evidence of the applicant pool for the periods, which is essential to a statistical determination of hiring patterns, but he employed such dubious analytical techniques as obtaining an overall percentage figure by averaging annual percentages for several different years, thus contravening the basic, well-recognized principle that such averaging by percentages produces meaningless and misleading results. Moreover it appears that there were dramatic changes in the size of the applicant pool and in the number of teachers hired in the West Hartford School District during the mid-1970's, which cast serious doubt upon the statistical significance of the defendants' evidence of allegedly unchanging hiring patterns. In 1968 and 1969, according to defendants' own figures, West Hartford hired 129 and 136 teachers, of whom 28 and 33, respectively, were above the fifth step, and 17 (13%) and 15 (8%), respectively, were over 40. In 1975 and 1976, by contrast, the District hired only 35 and 53 teachers, a substantially smaller group, of whom 7 and 10 were above the fifth step and 2 (6%) and 4 (8%), respectively, were over 40.[2]

Cases involving statistics can pose a formidable challenge to a court. As the Supreme Court has observed, " 'Statistics . . . come in infinite variety. . . . [T]heir usefulness depends on all the surrounding facts and circumstances' . . . . Only the trial court is in a position to make the appropriate determination." *Hazelwood v. United States*, 433 U.S. 299, 312, 97 S.Ct. 2736, 2744, 53 L.Ed.2d 768 (1977), quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). A trial court is best able to evaluate the credibility and professionality of the witnesses who provide statistical evidence, to consider all the statistical evidence advanced, to draw inferences from different parties' failure to include relevant statistics that are available to them, and to assess the validity of assertedly objective numerical evidence by considering the influence of unaccounted-for

---

1. In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 433 n.32, 95 S.Ct. 2362, 2379 n.32, 45 L.Ed.2d 280 (1974), the Supreme Court recognized the problematic validity of statistics produced by such a source:

    "It cannot escape notice that Albemarle's study was conducted by plant officials, without neutral, on-the-scene oversight, at a time when this litigation was about to come to trial. Studies so closely controlled by an interested party in litigation must be examined with great care."

2. Ms. Geller has conceded that the "sixth step" policy was never applied as an absolute exclusionary barrier to applicants over 40.

factors upon the numbers presented. Where, as here, the statistical evidence, or its absence, leads to an indisputable result, the judge is justified in taking the evaluation of the statistics away from the jury.

Here Judge Blumenfeld rightly found that the "sixth step" policy was discriminatory on its face. From there, he apparently declined to rely on statistics either to establish as a matter of law plaintiff's position that the policy was applied or to support defendants' position that it was not applied. Absent statistics regarding any changes in the applicant pool for teaching jobs as overall hiring decreased, comparative evidence of overall hiring percentages carries little weight, since these percentages may have remained constant despite an increase or fall–off in over–40 applicants. In the face of these deficiencies in the statistical proof and the existence of testimony that the "sixth step" policy was applied in Ms. Geller's individual case, which was disputed, Judge Blumenfeld properly submitted the issue of whether it was applied to the jury, which resolved the question in her favor by finding that the "sixth step" policy was one reason for the hiring of a younger replacement.

Defendants' second line of defense, somewhat inconsistent with their contention that the "sixth step" policy was never followed, is that the policy, if applied, was supportable as a necessary cost–cutting gesture in the face of tight budgetary constraints. This cost justification must fail, however, because of the clear rule that

"a general assertion that the average cost of employing older workers as a group is higher than the average cost of employing younger workers as a group will not be recognized as a differentiation under the terms and provisions of the Act, unless one of the other statutory exceptions applies. To classify or group employees solely on the basis of age for the purpose of comparing costs, or for any other pur-

pose, necessarily rests on the assumption that the age factor alone may be used to justify a differentiation–an assumption plainly contrary to the terms of the Act and the purpose of Congress in enacting it. Differentials so based would serve only to perpetuate and promote the very discrimination at which the Act is directed." 29 C.F.R. § 860.103(h) (1979).

Accord, *Marshall v. Arlene Knitwear, Inc.,* 454 F.Supp. 715, 728 (E.D.N.Y.1978) ("Where economic savings and expectation of longer future service are directly related to an employee's age, it is a violation of the ADEA to discharge the employee for those reasons" (citations omitted)); *Laugeson v. Anaconda Co.,* 510 F.2d 307, 316 (6th Cir. 1975) ("Since it was obvious that economic conditions had to play an important part in the decision, it was vital for the jury to know that this alone would not dispose of the case if Laugeson's age induced Anaconda to discharge him instead of someone else"). Accordingly, we conclude, that Ms. Geller established disparate impact by proving that she was subjected to a facially neutral policy disproportionately disadvantaging her as a member of a protected class. *Griggs v. Duke Power Co., supra; Dothard v. Rawlinson, supra.*

*Disparate Treatment*

The record also reveals that, in addition to making out a case of disparate impact, Ms. Geller established a prima facie case of discriminatory treatment under *McDonnell Douglas, supra,* satisfying the oft–repeated four conditions prescribed by the Court in that case. At age 55 she was clearly within the protected group under ADEA. She applied for the teaching job, was concededly qualified for it, and was even hired temporarily to perform it. She was then released, and saw a younger person placed in the job for which she was concededly qualified. These undisputed facts are sufficient to place upon the defendants the burden of rebutting her prima facie case.[3] For rea-

---

**3.** Discriminatory treatment analysis is no less applicable to this case because the trial court failed to instruct the jury on the specific elements of a *McDonnell Douglas* prima facie

case. See *Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) ("The method suggested in *McDonnell Douglas* is merely a sensible, order-

sons already stated, the defenses that the "sixth step" policy was not applied to Ms. Geller and that, if applied, it was cost–justified, must be rejected. The only other defense, that the discharge of Ms. Geller in favor of a younger teacher, was not motivated by the policy but by the superior competence of the latter candidate, was rejected by the jury's findings.

*Causation*

■ This leads us to defendants' final contention, that the court erred in instructing the jury as to the part age must play in determining whether they violated ADEA in discharging Ms. Geller. In order to make out a case under ADEA, Ms. Geller was not required to show that age discrimination was the *sole* cause of her discharge. Where an employer acts out of mixed motives in discharging or refusing to hire an employee, the plaintiff must show that age was a causative or determinative factor, one that made a difference in deciding whether the plaintiff should be employed. See *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979) (plaintiff must prove that age was the " 'determining factor' in his discharge in the sense that 'but for' his employer's motive to discriminate against him because of age, he would not have been discharged"; *Laugeson v. Anaconda Co.*, *supra*, 510 F.2d at 317 ("We believe it was essential for the jury to understand from the instructions that there could be more than one factor in the decision to discharge him and that he was nevertheless entitled to recover if one such factor was his age and if in fact it made a difference in determining whether he was to be retained or discharged. This is so even though the need to reduce the employee force generally was also a strong, and perhaps even more compelling reason"). Accord, *Cova v. Coca Cola Bottling Co.*, 574 F.2d 958 (8th Cir. 1978).

Both parties here suggest that the *Laugeson* and *Cova* standard is in conflict with the *Loeb* rule. We disagree. If age discrimination was a "factor . . . [which] made

a difference," then the employee's fortunes would have been "different" without the discriminatory action and age discrimination was therefore a "but for" cause of the result that did take place.

■ In the present case Judge Blumenfeld submitted to the jury a special interrogatory which asked whether the "sixth step" guideline was "one reason" for Ms. Geller's not being hired for the permanent art teacher's position. He refused to amend the interrogatory to read "one reason that made a difference." Standing alone, this refusal to amend might entitle defendants to a retrial since the jury, absent further instructions, could have found that the "sixth step" guideline, although considered by the Board as a factor, may not have been a determinative one. However, the interrogatory followed hard on the heels of an instruction in which the jury was told that it could find liability only if Ms. Geller's age "made a difference in determining whether she would be employed" and that "[i]f it did not make any difference–then of course she has not proved her case. But if it did, then she has." We conclude that, while it would have been advisable to repeat the gist of the latter language in the interrogatory, the instructions and the interrogatory, read together, were adequate. In this context the words "a reason," as used in the interrogatory, meant a reason which made a difference and hence were sufficient. Our view is fortified by undisputed evidence, including testimony of Dr. Johnson and Messrs. Metzger and Hedrick, as well as tape recordings of conversations between Ms. Geller and the various defendants, that the "key factor" was the "sixth step" policy. The principal of the school, Dr. Johnson, testified that she "rendered an excellent service. I have nothing but praise for her."

*Equitable Relief*

We next turn to Ms. Geller's contention that the district court erred in denying her equitable relief beyond the damages award-

ly way to evaluate the evidence in light of common experience as it bears on the critical

question of discrimination"); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979).

ed by the jury. Title 29 U.S.C. § 626(c)(1) provides, "Any person aggrieved [by an alleged violation of the ADEA] may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter." Section 626(b) defines the available legal and equitable relief as "including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability of amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section." The Supreme Court, defining which forms of relief were legal and which equitable so that it could determine which should be submitted to a jury, has noted that § 626

"does not specify which of the listed categories of relief are legal and which are equitable. However, since it is clear that judgments compelling 'employment, reinstatement of promotion' are equitable, see 5 J. Moore, Federal Practice Par. 38.-21 (1977), Congress must have meant the phrase 'legal relief' to refer to judgments 'enforcing . . . liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation.' " *Lorillard v. Pons, supra*, 434 U.S. at 583 n.11, 98 S.Ct. at 871 n.11.

█ Judge Blumenfeld viewed reinstatement as inappropriate because he interpreted the jury's decision granting damages equal to one year's salary at Bugbee School as a factual conclusion that Ms. Geller was deprived of only one year's employment by the defendants' discriminatory action. We agree with this conclusion. Ms. Geller had never formally been hired as a permanent teacher during the time she was working but had merely been told to get started. Permanent reinstatement therefore is unwarranted.

█ On the other hand, we disagree with the trial judge's refusal to consider Ms. Geller's request for lost pension benefits on the ground that "[d]amages for lost pension benefits are one component of the overall damages suffered by a plaintiff, which a jury may assess in ADEA actions."

Despite some case law that supports viewing lost pension rights as an aspect of damages, see *Fellows v. Medford Corp.*, 431 F.Supp. 199, 201 (D.Or.1977), the better view is that these rights fall within the category of equitable relief, see *Cleverly v. Western Electric Co.*, 450 F.Supp. 507, 510 (W.D.Mo.1978), *affd.*, 594 F.2d 638, 640 (8th Cir. 1979). As distinguished from damage awards, which are payable to the plaintiff, pension benefits are paid into pension annuity funds. They merely replace the benefits that would have accrued during the year of employment wrongfully denied to Ms. Geller. Because a judge exercising his equitable power over a discrimination action should afford "make–whole" relief to wronged plaintiffs, *Rodriguez v. Taylor*, 569 F.2d 1231, 1238 (3d Cir. 1977), we remand to the district court with directions to award pension rights to plaintiff for the 1976–77 year, to be paid into the Connecticut Teachers' Pension Fund. Plaintiffs' application for reasonable attorney's fees in prosecuting this appeal is granted in the sum of $500 plus her costs in prosecuting the appeal and defending against defendants' cross–appeal.

The judgment appealed from by the defendants is affirmed. The district court's order denying equitable relief to the plaintiff is affirmed except as to the denial of pension benefits which is reversed to the extent indicated.

LUMBARD, Circuit Judge (dissenting): I dissent.

We all agree that the crucial question for the jury's determination was whether age discrimination was a factor which made a difference in determining whether plaintiff was to be retained or discharged. Although the trial judge so told the jury in his oral instructions, he refused to word the written interrogatory submitted to the jury in accordance with his oral instructions. Thus, what the jury took into the juryroom read as follows:

1. Was the sixth step guideline one reason for Mrs. Geller not being hired for the permanent art teacher's position at the Bugbee Elementary School?

The trial judge had previously advised counsel of his proposed wording of the interrogatory. Counsel for the defendants specifically objected in the following colloquy:

> Mr. Post: Sir, could I ask that that interrogatory track with your charge to the Jury and say, "One reason that made a difference"?
>
> The Court: No. If it was one reason, that is sufficient.
>
> Mr. Post: That made a difference in their decision.
>
> The Court: No. If it was one reason.

I cannot escape the conclusion that the special interrogatory must have been uppermost in the jury's mind during its deliberation. Even if any juror had remembered the oral instructions, the written interrogatory would surely settle conclusively any question in the mind of any juror. And it was the question in the interrogatory which the jury answered and not anything else.

It follows that the restriction of the written interrogatory was error and that it was an error which could have resulted in a different verdict. It is not so overwhelmingly clear to me as it seems to be to my brothers that the jury would have decided the same way if the trial judge had conformed the wording of the interrogatory to his oral instructions, as he certainly should have done. In this case the jury should have made their decision on a proper instruction; it is not enough for my brothers to do it for them. So that a jury may decide the case on a proper instruction, and on an interrogatory in accordance with the instruction, I would reverse and remand for a new trial.