**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION**

v.

**GOVERNOR MIFFLIN SCHOOL DISTRICT and Governor Mifflin Education Association.**

**Civ. A. No. 85–0241.**

United States District Court,
E.D. Pa.

Oct. 9, 1985.

Spencer H. Lewis, Jr., Yolanda R. Hughes, Philadelphia, Pa., for plaintiff.

S. Martin Herring (GMEA), Jenkintown, Pa., John F. Stott (GMSD), Reading, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Presently before me is plaintiff's motion for partial summary judgment and defendants' motions for summary judgment. For the reasons set forth below, defendants' motions will be granted and plaintiff's motion will be denied.[1]

*Background*

Plaintiff Equal Employment Opportunity Commission ("EEOC") is challenging the salary system and pay raises negotiated between the Governor Mifflin School District ("GMSD") and Governor Mifflin Education Association ("GMEA") over the years 1981 through 1984. The facts appear to be largely undisputed although they are somewhat complicated.

Before 1974, the GMSD had a fifteen-step salary system. Under that system, teachers entered at step one and progressed year-by-year to step fifteen. Once they attained step fifteen, that is after they had amassed fifteen years seniority, there was no further step-by-step advancement. Each step increase equated with an increase in salary. In addition, all teachers in the system received a yearly salary increase. Thus, a teacher moving from step five to step six received an increase equivalent to the difference between the new step six salary and the old step five salary. Teachers at the highest step did not get a step increase. They did, however, receive a salary increase each year.

Beginning in 1974, this system changed. From that point until the 1983–1984 academic year, additional steps were added to the top end of the salary ladder each year. As a result, the number of steps increased from fifteen to twenty-eight. No teacher during this period ever reached the top step of the system because the top step slipped upward each year. Between 1974 and 1981, each teacher received a yearly salary increase of a set dollar amount. This amount was identical for all teachers in the district.

Beginning in 1981, a new method of distributing salary increases was instituted. From that year until the 1983–1984 academic year, each teacher received a raise equal to a set dollar amount plus a percentage of his or her yearly salary. Thus, all teachers would, for example, receive $1,000 plus five percent of their salary as a yearly

---

1. Plaintiff and defendant Governor Mifflin Education Association have moved for leave to file supplemental briefs. These motions are both granted. These briefs have already been filed and I have relied on them in reaching this decision.

increase. The result of this was that the highest paid teachers (those with the most seniority at the high end of the salary system) received the largest raises. Thus, the disparity between the highest paid teachers and the lowest paid teachers grew each year.

In 1983, the GMEA proposed a new system. Under this proposal, the number of steps were to be cut and the number of steps fixed. A teacher would advance step-by-step until he or she reached the top step. Each year until then, the teacher would receive a set "step increase." In addition, there would be an overall raise given to all teachers. This proposal was adopted by the GMSD.

The new system had a number of practical effects. Of primary importance to this suit is that the existing step system was compacted. In 1983, there were twenty-eight steps. Under the "compaction plan" the number of steps was reduced to twenty-four. All teachers received a raise of $1,288. With this raise, the salary for those teachers at step twenty-eight became $27,360. This salary became the top salary for the district and all those who were to be at step twenty-four or above had their salaries adjusted upward to this amount. In addition, all those teachers below step twenty-three received $1,288 plus a $400 step increase. As a result of this compaction, teachers below step twenty-three received a raise of $1,688; those at step twenty-three received $1,738; those at steps twenty-four and twenty-five received $1,513; those at steps twenty-six and twenty-seven received $1,401 and those at step twenty-eight received the flat $1,288.

The EEOC claims that the salary increase for the years 1981–1982 and 1982–1983 discriminated against older teachers in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. In addition, the EEOC claims that the salary adjustments made pursuant to the compaction plan also violated the ADEA. The basis for these claims is that older employees in 1981 and 1982 received less of an effective salary increase than did younger employees because the increases in those years included a fixed amount in addition to the percentage increase. In 1983–1984, the EEOC argues, employees at steps twenty-four through step twenty-eight received a lower increase than did younger teachers. The EEOC admitted at oral argument that the only method of distributing pay increases that comported with its interpretation of the ADEA would be a simple percentage increase made across-the-board.

Presently before me is the EEOC's motion for partial summary judgment on liability and defendants' motions for summary judgment. The parties have raised a number of difficult legal issues some of which involve unsettled areas of the law.

## Discussion

Summary judgment may be granted when it has been established that there are no issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Small v. Seldows Stationary*, 617 F.2d 992 (3d Cir.1980). The court does not decide issues of fact, but merely determines if there is an issue of fact to be tried. *Ettinger v. Johnson*, 556 F.2d 692 (3d Cir.1977). The facts must be viewed in the light most favorable to the non-moving party and any reasonable doubt regarding the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Ins. Co. v. Bodie*, 682 F.2d 436 (3d Cir.1982). The resolution of the pending motions is made easier by the fact that the parties do not seem to dispute the relevant facts.

Defendants have attacked the EEOC's case in a number of ways. As a threshold matter, they contend that claims concerning the 1981–1982 and 1982–1983 academic years are barred by the statute of limitations. They also claim that the EEOC cannot proceed under a disparate impact theory under the ADEA; that the disparate impact approach cannot be applied in a case involving compensation systems; that there was no disparate impact even if that

theory is available to the EEOC, and that there were "reasonable factors other than age" which justified the disparate impact, if any does exist. After a careful review of the memoranda of law submitted by the parties, I have concluded that the EEOC's claims concerning the 1981–1982 and 1982–1983 academic years are time-barred and that even if a disparate impact theory is available in an ADEA case challenging a compensation system, the EEOC has not made out a prima facie case of discrimination and that the defendants have demonstrated that their decisions were made based on "reasonable factors other than age."

### 1. The Statute of Limitations

Section 4(a) of the ADEA provides:

(a) It shall be unlawful for an employer—

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;

29 U.S.C. § 623(a).

The rights created by this section are "enforced in accordance with the powers, remedies, and procedures" of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 626(b). The FLSA establishes that an action will normally be barred by the statute of limitations if brought more than two years after the discriminatory event took place. An exception is made for "willful" violations which may be challenged up to three years after the event took place. See 29 U.S.C. § 255. (The Portal-to-Portal Act established a statute of limitations for actions brought under the FLSA.)

The EEOC filed this action on January 16, 1985. Thus, unless the three-year limit applies, all causes of action which accrued before January 16, 1983 are time-barred. Because the negotiations for, and the adoption of, the collective bargaining agreements for the 1981–1982 and 1982–1983 academic years occurred before that date, unless the three-year statute of limitations applies, the EEOC's claims with regard to those years are time-barred.

"Willful" is not defined in either the FLSA or the ADEA. This "unfortunate" term, see Wehr v. Burroughs Corp., 619 F.2d 276, 281 (3d Cir.1980), is capable of a myriad of meanings principally because it has a long history as a term of art in the criminal law. In Trans World Airlines v. Thurston, —— U.S. ——, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), the Supreme Court interpreted the term "willful" in the context of the ADEA for the first time. Unfortunately, Thurston arose from the parallel usage of the term in the liquidated damages context,[2] and as such does not directly answer the question before me.

In Thurston, the Supreme Court held that a violation of the ADEA was willful if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Id. —— U.S. at ——, 105 S.Ct. at 624 (quoting Thurston v. Trans World Airlines, 713 F.2d 940, 956 (2d Cir.1983)). The Court expressly rejected an interpretation of willful which was more lenient. This rejected definition, which is identical to the one urged by the EEOC, would make a violation willful if the employer "knew the Act was in the picture." See e.g., Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir.1971), cert. denied, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1971); EEOC v. Central Kansas Medical Center, 705 F.2d 1270, 1274 (10th Cir.1983). The Court reasoned that the liquidated damage provisions of the Act were intended to be

---

**2.** Under the ADEA (incorporating provision of the Portal-to-Portal Act), a defendant who has committed a willful violation may be liable for double damages.

punitive in nature and that Congress could not have intended for the ADEA to punish all acts committed if the employer "knew the Act was in the picture." *Thurston* — U.S. at ——, 105 S.Ct. at 625. The Court stated: "[W]e are unpersuaded by respondents' argument that a violation of the Act is 'willful' if the employer knows of the potential applicability of the ADEA. Even if the 'in the picture' standard were appropriate for the statute of limitations, the same standard should not govern a provision dealing with liquidated damages." *Id.* (note omitted). The Court specifically noted that the Circuits were split regarding whether the same standard should apply to both liquidated damages and the statute of limitations. *See id.* at n. 21. (citing *Kelly v. American Standard, Inc.,* 640 F.2d 974 (9th Cir.1981) (standards for liquidated damages and statute of limitations different); *Spagnulo v. Whirlpool Corp.,* 641 F.2d 1109 (4th Cir.1981) (standards the same)). Since *Thurston,* at least one court has held that one standard applies to both aspects of willfullness, and has applied the *Thurston* standard. *See Slenkamp v. Burrough of Brentwood,* 603 F.Supp. 1298, 38 Fair Empl.Prac.Cas. (BNA) 73 (W.D.Pa. 1985).

A review of the *Thurston* decision and the nature and purpose of the two-tiered system created by the FLSA suggest that there should be two different standards. The *Thurston* Court stressed that liquidated damages are intended to punish a violator of the act and are therefore quasi-criminal in nature. The policy behind the award of liquidated damages is to deter future violators of the Act. *See Dean v. American Security Insurance Co.,* 559 F.2d 1036, 1039–40 (5th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). The two-tiered statute of limitations has different functions entirely. *See Kelly,* 640 F.2d at 979.

■ Although the *Thurston* court did question whether there were any grounds for applying two different interpretations of willful, the Court's holding is limited to the standard to be applied to the issue of liquidated damages. Moreover, the Court chose the more stringent standard out of a concern that the punitive provisions of the ADEA not be applied against everyone who could be said to have "known the Act was in the picture" at the time she or he acted. On the other hand, the extended statute of limitations is not punitive in nature; it merely extends the ability of a plaintiff to bring a suit in a situation in which the discriminating defendant knows that the Act applies to the type of actions she or he has taken. *See also Wehr,* 619 F.2d at 282–83 (Court stresses that a lower standard should be applied in connection with the term willful in civil as opposed to criminal cases). I therefore conclude that although a plaintiff must show actual knowledge or reckless disregard of the statute in order to recover liquidated damages, she or he must only demonstrate that the defendant knew that the Act was in the picture in order for the three-year statute of limitations to apply.

■ Even under this more liberal standard, however, the EEOC has failed to meet its burden. The EEOC apparently concedes that there was no actual knowledge on the part of the defendants that the ADEA prohibited the salary scheme in effect. Plaintiff's memorandum in support of its motion for summary judgment at 22 (citing DiCintio deposition at 117–18; Riley Deposition at 36). The EEOC argues, however, that the defendants had constructive knowledge and that this constructive knowledge makes their actions willful. In support of this argument, the EEOC points to the placard requirement of the ADEA which mandates that all employers post a notice of the ADEA in the workplace. This provision applies to all employers covered under the Act.

The flaw in the EEOC's constructive notice argument is that it would effectively remove the two-tiered limitations system incorporated into the ADEA. Because all employers are required to post the notice, all would have constructive knowledge of the ADEA and all would therefore be acting willfully at all times. This argument

goes too far. Certainly the mere fact that Congress created two distinct statutes of limitations means that Congress intended that some acts would fall under the two-year statute. The EEOC's position would make all actions subject to the three-year requirement. Although the "in the picture" standard is a lower one than the "reckless disregard" standard adopted in *Thurston*, it is not so low as to sweep all employer actions into the three-year statute. In the present case, there is unrefuted testimony by those involved in the negotiation of the contract that they were unaware of the ADEA's prohibitions. The EEOC has presented no evidence to refute this lack of actual knowledge of the Act. There is simply no basis other than the "constructive notice" theory of the EEOC or idle speculation for me to conclude that the defendants were aware that the "act was in the picture." I therefore conclude that the claims based on the 1981–1982 and 1982–1983 academic years are time-barred.

2. *Disparate Impact under the ADEA*

Defendants argue passionately that the disparate impact theory developed under Title VII should not be transferred to the context of the ADEA. Although this is a close question, defendants' arguments fail.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court held that Title VII extends to non-intentional discrimination. Since *Griggs*, the courts have elaborated the "disparate impact" theory under Title VII. The EEOC apparently concedes that any discrimination that took place in this case was not the product of an intentional decision to discriminate against older teachers. Rather, it argues that the salary decisions made by the defendants affected older teachers disproportionately to younger teachers.

As the Supreme Court has noted, Title VII was the main inspiration for the language of the ADEA, *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1977). Thus, it would appear perfectly reasonable to assume that the interpretation of Title VII made in *Griggs* would be equally applicable to the ADEA. Indeed, the Second Circuit so concluded after a cursory examination of this issue. *Geller v. Markham*, 635 F.2d 1027 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). *Geller* has been followed by a number of other courts. *See, e.g., EEOC v. Bordens, Inc.*, 724 F.2d 1390, 1394 (9th Cir.1984); *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 690 (8th Cir.1983). The Third Circuit has expressly left this question undecided. *Massarsky v. General Motors Corp.*, 706 F.2d 111, 120, *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).[3]

Defendants argue that for several reasons the application of the disparate impact doctrine to ADEA cases is improper. These arguments are based both on the language of the ADEA and its legislative history.

First, defendants point to § 4(f) of the ADEA, 29 U.S.C. § 623(f)(1) which provides:

> It shall not be unlawful for an employer, employment agency, or labor organization—

> (1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age, or where such practices involve an employee in a workplace in a foreign country, and compliance with such subsections would cause such employer, or a corporation controlled by such employer, to violate the laws of the

---

**3.** *Massarsky* was decided over the dissent of Judge Sloviter who would have followed *Geller*. Plaintiff cites *EEOC v. City of New Castle*, 32 Fair.Empl.Prac.Cas. (BNA) 1409, 1412 (W.D.Pa. 1983) as a case that follows *Geller*. The *New*

*Castle* court apparently read *Massarsky* as adopting the position taken in *Geller*. I believe that *New Castle* misread *Massarsky* in this regard.

country in which such workplace is located.

Defendants argue that the inclusion of the "reasonable factors other than age" language in § 623(f)(1) requires the conclusion that the ADEA reaches only to intentional discrimination. This argument is strengthened by *County of Washington v. Gunther*, 452 U.S. 161, 170–71, 101 S.Ct. 2242, 2248–49, 68 L.Ed.2d 751 (1981) in which the Court interpreted similar language in the Equal Pay Act. *Gunther* involved the Bennett amendment to Title VII which imports into that act elements of the Equal Pay Act. The Bennett amendment modified Title VII to make all pay discriminations "authorized" under the Equal Pay Act nonactionable under Title VII. One of the elements imported was an affirmative defense allowing employers to base pay systems on "any other factors than sex." In interpreting this language and simultaneously contrasting the operations of Title VII and the Equal Pay Act, the Court observed that, "[the affirmative defense] was designed ... to confine the application of the [Equal Pay] Act to wage differentials attributable to sex discrimination." *Id.* at 170, 101 S.Ct. at 2248. By contrast, Title VII was intended to reach to both overt discrimination and " 'practices that are fair in form, but discriminatory in operation.' " *Id.* (quoting *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853). Because the ADEA contains a provision like that discussed in *Gunther*, defendants argue that it too should apply only to cases of intentional discrimination.

For several reasons, I consider defendants' arguments based on *Gunther* to be misplaced. The Court's discussion of this issue was explicitly based on its reading of the legislative history and intent of the Equal Pay Act. For the reasons set forth below, I do not believe that the ADEA's legislative history provides the kind of unequivocal support for the interpretation urged by defendants that the Court found in the legislative history of the Equal Pay Act. *See generally Corning Glass Works v. Brennan*, 417 U.S. 188, 198–201, 94 S.Ct. 2223, 2229–31, 41 L.Ed.2d 1 (1974). More-over, although the Equal Pay Act language and the language found in the ADEA are similar, they are not identical. The Equal Pay Act excludes all pay differentiations based on "*any* factor other than sex" whereas the ADEA excludes actions based on "*reasonable* factors other than age." Although this may be a small difference, the language in the ADEA requires that a court evaluate the proffered explanations for an action to determine whether the non-age bases are "reasonable." The Equal Pay Act, on the other hand, involves an absolute defense. Thus, the ADEA's provision is more akin to the allowance of affirmative defenses under Title VII than it is to the Equal Pay Act. Under a disparate impact analysis, of course, once a plaintiff has established a prima facie case, the defendant may then demonstrate an acceptable justification for its actions. The plaintiff may still prevail, however, if the justification is pretextual.

Defendants also argue that the legislative history of the ADEA discloses that Congress intended for it to reach only intentional discrimination. Although this history has been described as surprisingly "lucid," *see* Blumrosen, Interpreting the ADEA: Intent or Impact, in *Age Discrimination in Employment* (M.B. Lake ed. 1981), it is far from clear that Congress intended to limit the application of the ADEA to cases of intentional discrimination. It is true that the legislative history does contain certain suggestions to that effect. It is also true that the origin of the ADEA was substantially different from Title VII. On balance, however, it is clear to me that Congress intended to treat the ADEA and Title VII identically. Although the history and origin of the two are different, the enacted statutes are virtually identical, a fact recognized by the Supreme Court in *Lorillard* in 1978. In that same year, Congress substantially amended the ADEA and no changes were made to reflect the purported desire to limit the ADEA to cases of intentional discrimination. Of course *Griggs* had been decided some seven years before. The ADEA was

again amended in 1984, after *Geller*, and although § 4(f)(1) was modified, no change was made to "correct" the erroneous interpretation given to the statute by *Geller*. *See* Older American Act Amendments of 1984, § 802(b)(1), Pub.L. 98–459 (1984) (codified at 29 U.S.C. § 623(f)(1)). To accept defendants' argument regarding the intent behind the ADEA would require the conclusion that Congress chose to copy Title VII for no real reason, then chose not to correct improper interpretations of the Act twice.

■ Although the legislative history of a piece of legislation is an important guide to its interpretation, the starting point must be the statute itself. In this case, the statute is the same as Title VII. In *Griggs*, the Supreme Court based its decision that Title VII reached to nonintentional discrimination on the plain language of the statute itself: "[t]he objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities.... Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 429–30, 91 S.Ct. at 852–53. Indeed, outside of the Court's discussion of § 703(h) of Title VII (dealing with the use of employment tests) there is not a single reference to the legislative history in the Court's opinion.

The language of Title VII and the ADEA are identical as relevant in this case. If the existence of the disparate impact approach is apparent from the "plain" language of Title VII, it must also be apparent from the plain language of ADEA.

This interpretation of the ADEA is bolstered by another aspect of the Act. As I have already discussed at some length, the ADEA incorporates two different standards for the application of the statute of limitations and for damages. Defendants can be subjected to double damages for willful violations of the Act and plaintiffs may bring suits within a longer period of time if the violation is willful. Prior to *Thurston*, many courts had interpreted willful as meaning intentional. *See Wehr*, 619 F.2d at 282–83; *Hodgson v. Hyatt*, 318 F.Supp. 390, 392–93 (N.D.Fla.1970) (FLSA case). *Thurston* developed a slightly different formulation, although it is clear that the *Thurston* standard for "willful" acts in terms of the liquidated damages provisions would not sweep in acts which were unintentional. *See Wehr*, 619 F.2d at 783 (court adopts standard of "intentional, knowing or voluntary" that is "used to characterize conduct marked by careless disregard whether or not one has the right to act." (quoting *Hodgson* )).

Congress clearly intended to create a two-tiered liability system in the ADEA. *Thurston*, —— U.S. at ——, 105 S.Ct. at 624–25. Acts which are intentional are subjected to double damages. If the ADEA reached only to intentional acts, all violations would be subjected to double damages and there would be no two-tiered system.[4]

■ I therefore conclude that although the question is a close one, the ADEA does reach to disparate impact type of cases.

### 3. *Disparate Impact and Compensation Cases*

Defendants argue that even if the ADEA comprehends disparate impact type of

**4.** Even if *Thurston* established a more demanding standard for the imposition of double damages, it would not change my decision on this issue. If the *Thurston* standard were higher than merely intentional (and I do not believe that it is), it is apparent that too great a percentage of cases would be liable for double damages. That is, if the ADEA reached only to intentional acts, and even if the *Thurston* standard were greater than "intentional," there would be too great a percentage of the total number of ADEA cases triggering double damages. Congress clearly intended that the liquidated damages provisions apply to the exceptional case rather than the normal case. To adopt defendants' reading of the reach of the Act would in my view reverse this.

742

cases, that theory itself does not reach to cases involving compensation systems.

It is certainly true that the disparate impact theory developed in cases involving challenges to job selection or promotion practices. The archetypal case is *Griggs* which involved a challenge to job application tests. Defendants argue persuasively that the theory should not be extended beyond the realm from which it sprang and that it is inapposite in a case challenging the operation of a compensation system such as the present case. In support of their position, defendants point to recent Supreme Court cases which cast some shadow over this area and to the recent Ninth Circuit decision in the Washington state comparable worth case.

In *Nashville Gas Co. v. Satty*, 434 U.S. 136, 144–45, 98 S.Ct. 347, 352–53, 54 L.Ed.2d 356 (1977), the Court stated: "[w]e again need not decide whether, when confronted by a facially neutral plan, it is necessary to prove intent to establish a prima facie violation of § 703(a)(1).... *Griggs* held that a violation of § 703(a)(2) can be established by proof of a discriminatory effect ... [Section] 703(a)(1) ... would appear to be the proper section of Title VII under which to analyze questions of sick-leave or disability payments." Although this language is not explicit, it does suggest that an attack on a compensation system must be brought under § 703(a)(1) of Title VII and that disparate impact has never explicitly been held to be viable under § 703(a)(1). Sections 703(a)(1) and (a)(2) correspond to §§ 623(a)(1) and (a)(2) of the ADEA.

Defendants also point to the recent decision of the Ninth Circuit in *American Federation of State, County and Municipal Workers v. State of Washington*, 770 F.2d 1401 (9th Cir.1985) ("*AFSCME*"). In *AFSCME* the Ninth Circuit addressed the viability of the comparable worth doctrine under Title VII. The court reversed the district court's holding that plaintiffs could proceed under a disparate impact model. In reaching its decision the court stated: "[d]isparate impact analysis is confined to cases which challenge a specific, clearly delineated employment practice applied at a single point in the job selection process...." The instant case does not involve an employment practice that yields to disparate impact analysis.... A compensation system that is responsive to supply and demand and other market forces is not the type of specific, clearly delineated employment policy contemplated by *Dothard* [*v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977)] and *Griggs;* such a compensation system, the result of a complex of market forces, does not constitute a single practice that suffices to support a claim under disparate impact theory." *Id.*

Whatever the correctness of this discussion, the present case is distinguishable from *AFSCME*. The Ninth Circuit did not focus, as defendants do, on which specific subsection of Title VII supports a challenge to a compensation system. Rather, it looked to the nature of the challenge and the nature of the challenged practice. Plaintiffs in *AFSCME* had launched a broad-based challenge to the ways in which the defendant's compensation system had developed over many years. This development resulted, in AFSCME's eyes, in a discriminatory payroll system. Thus, there was no discrete event or practice which led to the alleged discriminatory result. In the instant case, the EEOC is challenging a specific event: the setting of the 1983–1984 salaries and the adoption of the compaction plan. These are single events and are not similar in nature to the operation of the "free market system" that the *AFSCME* defendants claimed was responsible for the creation of the pay disparities at issue in that case.[5]

---

**5.** Defendant GMEA has submitted a brief filed by the Civil Rights Division of the Department of Justice as *amicus curiae* in *American Nurses Association v. Illinois*, No. 85–1766 (7th Cir). Although it is interesting to see the position of the Civil Rights Division in the area of comparable worth, this brief has no weight in this proceeding and I have not considered it in my decision.

Whether the disparate impact model can be applied in a compensation case is a difficult, unsettled question. Fortunately, I need not decide it. Even if plaintiff could proceed in this case on such a theory, it has failed to meet its burden of demonstrating a prima facie case. Furthermore, defendants have come forward with valid, nondiscriminatory reasons for their actions.

### 4. *Plaintiff's Disparate Impact Case*

The ADEA was enacted to promote employment of older Americans and to remove arbitrary age discriminations in employment. *See* 29 U.S.C. § 621(b); *EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). The Act's protections extend to all those in the protected age group, i.e., those between the ages of 40 and 70. The ADEA applies to state and local governments. 29 U.S.C. § 630(b)(2).

A plaintiff's burden in a disparate impact case is heavier than it would be in a disparate treatment case. *Massarsky*, 706 F.2d at 120. In order to establish a prima facie case under the disparate impact model, the plaintiff must show "that the facially neutral employment practice had a significantly discriminatory impact." *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982). "If that showing is made the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination.... Even in such a case, however, the [plaintiff] may prevail, if he shows that the employer was using the practice as a mere pretext for discrimination." *Teal*, 102 S.Ct. at 2531 (quoting *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854). The employer has no burden to come forward with any justification until the plaintiff has made out a prima facie case. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

Defendants contend that the plaintiff has not made out a prima facie case and that, even if it has, there are compelling business justifications that bring its actions within the "reasonable factors other than age" exception to the ADEA's prohibitions.

It seems beyond dispute that the salary steps in the GMSD are correlated with age. There is also no dispute that the individuals affected by the compaction system in the allegedly adverse way are all within the protected age group.

Defendants contend, however, that there has been no discrimination as a matter of law because the teachers at the most senior levels of the step system are also the highest paid. They contend that the EEOC has improperly focused on one aspect of the entire payroll system: the amount of the wage increases given for the 1983–1984 academic year.

It is not disputed that the oldest teachers in the GMSD are also the highest paid teachers. Defendants contend that this should essentially be the end of the inquiry. The EEOC on the other hand sees the fact that the highest paid teachers received a lower salary increase than those below them on the salary ladder as discriminatory. Although the defendants' argument may be somewhat overbroad, I believe that the EEOC has failed to demonstrate any discrimination in the GMSD's salary system.

In essence the EEOC would find any salary-step system with a top salary to be discriminatory, despite its protestations to the contrary. In any system in which there are a limited number of steps, and in which the relative disparities between the highest and lowest salaries are held constant, those at the higher end of the salary system will receive a lower effective yearly increase than those who are still progressing from step-to-step. At oral argument on this motion, the EEOC conceded that it considered only an equal effective percentage increase to accord with the ADEA as it interprets it. Requiring an equal percentage increase across-the-board would, however, make the number of steps grow each year and would also mean that the gap between the highest and lowest teachers would grow continuously.

Defendants argue that the Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), requires the conclusion that it is improper to focus on just one aspect of the compensation system. In *Gilbert*, the Court was faced with a challenge to the health insurance benefits available to General Electric employees. The specific claim was that the health plan did not cover maternity and pregnancy benefits. A class of female employees at General Electric sued claiming that this treatment of pregnancy benefits constituted a violation of Title VII. The Supreme Court held that it did not. Relying on *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the court held that a classification based on pregnancy was not equivalent to a classification based on sex. The Court also held that as long as the overall benefits available to employees under the insurance plan were equivalent, there was no discrimination. Defendants argue that this holding makes invalid any examination of the compensation system which does not look to the entirety of the payroll package.

Defendants have not been able to cite me any cases directly on point and the only cases I have located which apply *Gilbert* involve pregnancy benefits. *See e.g., Women in City Government United v. City of New York*, 563 F.2d 537, 540–41 (2d Cir.1977); *Guse v. J.C. Penney Co.*, 562 F.2d 6, 8 (7th Cir.1977); *Grogg v. General Motors Corp.*, 444 F.Supp. 1215, 1218–19 (S.D.N.Y.1978). None of these cases is very strong support for defendants' position, notwithstanding the broad language contained in some of the opinions.

In spite of the lack of direct support for their position, I believe that the defendants are essentially correct that it would be improper to focus too narrowly on a particular aspect of something like a compensation system. Such a system is designed to provide employees with an overall package of payroll benefits. The precise manner in which this is accomplished will obviously vary widely. It is true that the teachers at the top of the step system received the smallest increases, but they also received the highest pay. It is only when the amount of the pay increase is separated from all other aspects of the compensation system, and the amount given to the older teachers as opposed to the teachers with less seniority is examined in isolation, that anything remotely unusual can be seen. I believe that this dissection of the compensation system is improper.

The EEOC contends that *Connecticut v. Teal* prevents this conclusion. In *Teal*, the Court rejected an employer's reliance on a "bottom line" defense. *Teal* involved a challenge to job selection processes. The employer argued that even if its selection criteria were discriminatory, its work force was racially balanced and, therefore, the "bottom line" was that it was not discriminating. The Court rejected this argument. Its holding was predicated on its conclusion that the protections of Title VII applied to individual employees primarily rather than to a minority group as a whole. *Id.* 457 U.S. at 453–54, 102 S.Ct. at 2534. In the instant case, the defendants argue that the total payroll package received by each individual teacher is nondiscriminatory and therefore that the "bottom line" to each teacher is nondiscriminatory. *Teal* therefore does not cover this situation.[6]

Even assuming, however, that the EEOC has demonstrated a prima facie case,[7] the defendants have come forward with reasonable factors other than age upon which their decisions were based. These alternative grounds for the decisions reveal the nondiscriminatory nature of the defendants' actions.

---

6. Indeed, if *Teal* were to reach to this type of argument, it would conflict with the Court's holding in *Gilbert*.

7. The parties have spent a significant amount of energy discussing the impact of this case on other public sector salary systems including that of the federal government. Although I agree with defendants that there is no significant difference between the GMSD's system and that of the federal government, that fact standing alone is not material to this case.

The defendant has suggested a number of reasons for the compaction plan. The primary reasons appear to be the desire to limit the number of steps so that teachers would eventually reach the top of the salary ladder; the desire to shorten the time necessary for a teacher to reach the top of the salary system, and the desire to enhance the professional status of the teachers by creating a more reasonable number of steps with a fixed top step.

■ Under the ADEA, it is not unlawful for an employer to differentiate among its employees based on reasonable factors other than age even if that differentiation would otherwise be a violation of the Act. The actions taken by defendant fall within this exception.

Under the new system, all teachers reach the top of the salary system earlier than they would have otherwise. Moreover, even those at the top of the salary system were not harmed by the compaction plan. Those at step twenty-eight still received the highest salary in the system and still received a raise in salary equal to that received by all other teachers exclusive of step increases. The GMSD and the GMEA both had an equally valid desire to ensure that there would be no ever-increasing disparity between the highest and lowest paid teachers within the system. Under any approach acceptable to the EEOC, this result would be unattainable. Under the compaction plan, the overall earnings of all teachers would also be increased when considered as a career-long lump sum. Obviously, this is a valid goal of the GMEA.

The EEOC argues that all of these goals were achieved at the expense of the older workers in the system. I disagree with this characterization. Although the teachers between steps twenty-four and twenty-eight received less of an increase than those below them, this must always be so in any system in which there are fixed number of steps of set salary. Obviously, when an employee reaches the top step of such a system, she or he is no longer entitled to a step increase as before. This fact alone would not, in my view, render the system discriminatory where there are valid business reasons for the fixed-step system. Defendants have demonstrated those reasons here.

Plaintiff argues, however, that this is precisely the type of bottom line defense rejected in *Teal*. Once again, however, I believe that this case is distinguishable from *Teal*. That case involved employee selection processes, not compensation. That fact alone may serve to distinguish *Teal*. It is also apparent that at least some of the individual teachers in steps twenty-four and above will also be the beneficiaries of the enhanced professional status attached to reaching the top level of the salary system. In addition, unlike the situation in *Teal*, defendants do not seek to justify discrimination against members of the protected class by pointing to the treatment given to other members of the same class.

This case is much more similar to *Wambheim v. J.C. Penney*, 705 F.2d 1492 (9th Cir.1983) (per curiam), than it is to *Teal*. In *Wambheim*, the plaintiffs attacked the manner in which defendant distributed its insurance benefits. Penney had eliminated insurance coverage for spouses of Penney employees, unless the employee earned more than half of the combined income of the family. The result of this restriction was that wives of male employees were more often included within the plan than were husbands of female employees. Penney argued that these distinctions were made in order to benefit the largest number of employees with the greatest need. It argued that another system would result in increased health insurance premiums which would make health insurance too expensive for those with low incomes.

The concerns expressed by the defendants are similar to those accepted by the court in *Wambheim*. Although they are not as compelling as those presented in that case, they reflect a desire to improve the lot of the most teachers possible. I believe that this end has been accomplished in a non-discriminatory manner. I will therefore grant defendants' motion for

summary judgment and deny plaintiff's motion for partial summary judgment.