**Edwin J. WILLIAMS, Plaintiff,**

v.

**DICTAPHONE CORPORATION, Defendant.**

No. 98–CV–20C.

United States District Court, W.D. New York.

Sept. 16, 2000.

William E. Grande, Kenmore, NY, for Plaintiff.

McDermott, Will & Emery (Joel Cohen, of Counsel), New York, NY, Jaeckle, Fleischmann & Mugel LLP (Mitchell J. Banas, Jr., of Counsel), Buffalo, NY, for Defendant.

## DECISION AND ORDER

CURTIN, District Judge.

### INTRODUCTION

Plaintiff Edwin Williams brings this action against his former employer, Dictaphone Corp. ("Dictaphone"), pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* Item 1.[1] Williams claims that Dictaphone: (1) discriminated against him on the basis of his age by reducing his salary in July 1996; (2) retaliated against him on the basis of protected activity by placing him under intensive supervision in November 1996 and March 1997; and (3) discriminated and retaliated against him when it fired him in July 1997.

In November 1999, Dictaphone brought the present motion for summary judgment. Items 16–19. By his attorney, Williams submitted various opposing papers. Items 24–26, and 33. Subsequently, Dictaphone has had an opportunity to reply, Items 28–29, and Williams has filed a sur-reply. Items 31–32.

### FACTS

#### I. Background

Williams was born on June 20, 1945. Item 18, Exh. 3, p. 5. Originally hired as

---

**1.** In November 1999, Williams withdrew his claims against Gil Kamenir. Item 22.

an Account Representative for Buffalo, New York, in January 1975, *see id.* at 5–6, Dictaphone later appointed plaintiff to the position of Area Sales Manager in Buffalo in July 1976. *See* Item 19, ¶ 4. In 1980, Williams left Dictaphone because he believed that his opportunities for advancement were limited. *See* Item 18, Exh. 3, p. 8.

In 1991, however, Williams reapplied for a managerial position with Dictaphone. *See id.* at 9 and Item 19, ¶ 5. At that time, Williams spoke with Gil Kamenir ("Kamenir"), who was the Regional Vice President for Dictaphone's Eastern Region. *See* Item 18, Exh. 3, p. 21. In January 1992, Kamenir hired Williams as the Branch Manager for Norfolk, Virginia. *See id.* at 21–23; Item 33, Exh. 7, pp. 39–40. At the time of his re-hiring, Williams was 47 years old.

In August 1993, Dictaphone appointed Williams to the position of Branch Manager in Rochester, New York. *See* Item 18, Exh. 6. George Wallrich, the District Manager for Buffalo; and Barbara Bilka, the Regional Vice President for the Northern Region, were both involved in giving Williams this new position. However, it was Ms. Bilka who supervised Williams as Rochester's Branch Manager. *See* Item 18, Exh. 3, p. 27 and Item 19, ¶ 6. In February 1994, Bilka promoted Williams from Branch Manager to acting District Manager for Rochester. *See* Item 18, Exh. 3, p. 36 and Exh. 7. Bilka then appointed Williams to be Rochester's permanent District Manager in May 1995. *See* Item 18, Exh. 3, pp. 36, 38 and Exh. 8.

In October 1995, Dictaphone merged the Rochester and Buffalo districts into one district. Williams took over as District Manager for this newly consolidated district and received a pay raise in return. *See* Item 18, Exh. 3, p. 37 and Exh. 9.

In December 1995, Dictaphone offered to make Williams the District Manager for New York City. *See* Item 18, Exh. 3, p. 39. Williams turned the position down because the increase in pay that was being offered was not great enough to offset the increased cost of living that he and his family would have encountered in New York. *See* Item 26, Williams, ¶¶ 52–53.

## II. 1996 Reorganization for Dictaphone & Changes in District Managers' Salaries

In January 1996, Dictaphone reorganized its corporate structure by splitting the company into two divisions—Healthcare and Commercial. *See* Item 18, Exh. 3, p. 43. Under the reorganized structure, Williams became the Buffalo District Manager for the Commercial Division. *See* Item 18, Exhs. 10 & 11. Williams' sales quota was reduced from $240,000 to $110,558, and his sales staff was reduced from fourteen to seven. *See* Item 18, Exh. 3, pp. 45–46 & Exh. 11; Item 19, ¶ 10.

Under the reorganization, Dictaphone also set $36,000 as the maximum salary for all of its District Managers. Item 19, ¶ 11. For District Managers whose 1995 salary was more than $36,000, Dictaphone created a "grandfathering" scheme. In order to keep their "grandfathered" salaries, affected District Managers had to attain at least 80 percent of their year-to-date sales quota as of May 1996. *See* Item 18, Exh. 3, p. 48. In May 1996, Dictaphone determined that Williams had attained only 74 percent of his year-to-date sales quota. As a result, Dictaphone reduced Williams' salary from $39,717 to $36,000. *See* Item 19, ¶ 14.[2]

## III. Job Openings for Regional Vice Presidents

In May 1996, Dictaphone had two openings for Regional Vice Presidents—one in

2. Williams maintains in his affidavit that Dictaphone never contacted him regarding his May 1996 review and, as a result, that Dictaphone could not have conducted a review of his performance at that time. Yet, Williams admitted at his deposition that his May 1996 review revealed that he had not achieved 80 percent of his year-to-date quota. Item 18, Exh. 3, pp. 49–50. By his subsequent affidavit, Williams cannot seek to contradict the substance of his prior testimony. *See Mack v. United States,* 814 F.2d 120 (2d Cir.1987).

the Central Region and the other in the Western Region. *See* Item 18, Exh. 3, p. 52. Williams applied for both of these positions, but was neither interviewed nor hired. Instead, Dictaphone's Vice President of Sales, Robert Ronchi, hired Mark Jamieson, age 35, as the Central Region's Vice President and Greg Van den Heuven, age 35, as the Western Region's Vice President. Mr. Jamieson had worked for Dictaphone as a District Manager since January 1995 and had been Dictaphone's number one District Manager for the year 1995. *See* Item 19, ¶ 18. Mr. Van den Heuven had been the District Manager of Phoenix since December 1989 and had many contacts in the Western Region as a result of his work there.

## IV. Williams' Performance as District Manager

Williams was successful as a District Manager from February of 1994 through the end of 1995. *See, e.g.,* Item 33, Exhs. 36–46 (documenting Williams' success). After the 1996 restructuring, Mr. Kamenir took over as the Vice President for the Northeast Region's Commercial Division and became Williams' supervisor. Item 33, Exh. 7, pp. 11, 17. Kamenir and Williams paint completely different pictures of how Williams performed from January 1996 until his discharge in July 1997.

Overall, Dictaphone insists that there were three primary reasons why Kamenir became profoundly dissatisfied with Williams: (1) his failure to communicate with Kamenir regarding his work schedule and time off;[3] (2) his poor client relations;[4] and (3) his poor sales figures.[5] For his part, Williams contests Kamenir's version of the facts on each and every one of these alleged areas of deficiency. *See* Item 26, Williams, ¶¶ 80–82, 86–90, 98; *id.,* McKeon Affidavit.

Kamenir's professed dissatisfaction with Williams caused him to put Williams on a "Work Improvement Plan" and "Performance Improvement Plan," *see* Item 33, Exh. 7, pp. 37, 47–50; Item 18, Exh. 18, and ultimately led Kamenir to fire Williams in July 1997. Item 18, Exh. 21. However, Williams insists that there were many factors that led to this drop-off and that Kamenir discriminatorily disregarded each of these factors when evaluating Williams' performance. *See* Item 26, Williams, ¶¶ 27–32, 64, 70–71, 76a, 111–17, 121–22; Item 33, Exhs. 33 and 48.

## DISCUSSION

### I. Standards of Law

#### A. *Summary Judgment*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving a motion for summary judgment, the court must construe all evidence in the light most favorable to the nonmovant and must draw all reasonable inferences in his favor. *See Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The movant has the initial burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c). However, once that burden has been met, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Moreover, "[w]hen the moving party has carried its burden

---

**3.** *See* Item 33, Exh. 7, p. 30–33, 90; Item 18, Exhs. 12 and 22.

**4.** *See* Item 16, ¶¶ 47–48; Item 18, Exh. 14.

**5.** *See* Item 18, Exh. 18; and Item 28, Exh. 1, p. 86.

under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *Age Discrimination*

■ In an employment discrimination case, the plaintiff has the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In order to establish a prima facie case of age discrimination, the plaintiff must show that he was (1) within the protected age group; (2) qualified for the position; (3) suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998). Plaintiff's burden of establishing a prima facie case, however, can be described as "minimal." *See St. Mary's Honor Ctr.,* 509 U.S. at 506, 113 S.Ct. 2742.

If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises. *See Stratton v. Department for the Aging,* 132 F.3d 869, 879 (2d Cir. 1997). The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for discharging the employee. *See Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir. 1998). If the employer articulates a non-discriminatory reason for its employment decision, the presumption of discrimination raised by the prima facie case "simply drops out of the picture." *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742.

At this stage, the plaintiff must produce evidence to support the reasonable inference that discriminatory animus more likely than not motivated the adverse employment action. To support such a showing, the plaintiff may "show[ ] that

the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In addition to showing the falsity of the proffered reasons, though, the plaintiff must also carry his burden on the ultimate issue: that discriminatory intent motivated the decision (*i.e.,* that the proffered reasons were just a pretext for the discrimination). On this count, plaintiff may continue to rely on evidence that was submitted to support a prima facie claim of discrimination. *Id.* at 255 n. 10, 101 S.Ct. 1089. In other words, "[t]he factfinder's disbelief of the reason put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's,* 509 U.S. at 511, 113 S.Ct. 2742. Plaintiff need not prove that age was the only or even the principal factor in the adverse employment action, but only that age was at least one of the motivating factors in that decision. *See Renz v. Grey Advertising Inc.,* 135 F.3d 217, 222 (2d Cir.1997).

### C. *Retaliation*

■ The ADEA also prohibits an employer from taking any adverse employment action against an employee who complains about an unlawful practice. Absent direct proof of retaliatory intent, the court should apply the familiar burden-shifting framework set forth in *McDonnell Douglas. See Sumner v. U.S. Postal Service,* 899 F.2d 203, 208 (2d Cir.1990) (citations omitted). To establish a prima facie case of retaliation under the ADEA, a plaintiff must show: (1) protected activity under ADEA that was known by the alleged retaliator; (2) an adverse employment action taken against the person who engaged in the protected activity; and (3) a causal connection between the protected activity and the adverse employment action. *De-*

*Cintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987). It should be noted that "[p]roof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment . . . ." *Id.*

Much like the analysis of a discrimination claim, if the plaintiff meets this initial burden, the defendant must then articulate a legitimate, non-discriminatory reason for its action. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995). If the defendant articulates a legitimate, non-discriminatory reason for its action, the plaintiff must then prove that the proffered reason was merely a pretext for retaliation *and* that an impermissible motive was actually a motivating factor in defendant's actions. *See id.*

## II. Reduction in Salary as Discriminatory

 Williams alleges that Dictaphone discriminated against him when, in 1996, it instituted a salary reduction policy that almost exclusively affected District Managers over 40 years of age.

### A. *Disparate Treatment Theory*

As a threshold matter, the court notes that Williams argues his salary reduction claim under a theory of disparate *treatment,* rather than under a theory of disparate *impact.* Yet, Williams argues that there is evidence of a discriminatory pay reduction only on the basis of the following facts: (1) the 1996 salary policy applied only to District Managers whose salaries exceeded $36,000, and (2) it was mostly District Managers who were over 40 years of age who had salaries in excess of $36,000. These allegations, on their own, only show that the 1996 salary policy was a uniformly applied and "facially neutral" policy which may have impacted older District Managers more so than younger managers. Such an allegation does not support an inference of disparate *treatment,* but *could* support an inference of disparate *impact.*

Nevertheless, Williams argues that the 1996 salary policy resulted in disparate treatment because Dictaphone applied the policy in a discriminatory way. Specifically, Williams contends that Dictaphone refused to consider the fact that his grand jury duty and an intermittent illness prevented him from meeting his 80 percent sales quota by May 1996. *See* Item 26, Williams, ¶¶ 27–31, 70–71 and Exh. 48. In addition, Williams contends that Dictaphone's age bias is belied by the fact that it arbitrarily elected not to enforce the salary reduction policy against a District Manager by the name of Randy Rawlingson. Item 26, Williams, ¶ 65.

However, neither of these arguments tend to show that Dictaphone applied the 1996 salary policy in a discriminatory way. First, Dictaphone may have enforced the salary policy against Williams even though he served on jury duty from late May until July 1996 and was intermittently suffering from a debilitating stomach illness. Yet, when it came to the 1996 salary policy, there is no evidence that Dictaphone accommodated younger District Managers or treated them more leniently. Second, it is conceded that Dictaphone did not reduce the salary of Southern Texas's District Manager, Randy Rawlingson. Yet, Williams implies that Rawlingson was *over* 40 years of age at the time he evaded enforcement of the 1996 salary policy—a fact that weighs against Williams' case rather than in favor of it. *See* Item 32, ¶ 8. Furthermore, Dictaphone has provided a legitimate explanation why Rawlingson's salary was not reduced. Item 19, ¶ 16 (stating that any salary reduction for Rawlingson would have been minimal—perhaps $77 over a 12–month period).

In light of the foregoing, Williams cannot argue that the 1996 salary policy amounted to disparate treatment of District Managers who were over 40 years of age. If Williams can prevail at all on the

salary reduction claim, it must be under a theory of disparate impact.

## B. *Disparate Impact Theory*

 Here, the court notes that Williams does not urge a disparate impact argument in his papers. Nevertheless, because of certain factual allegations made by Williams, the court believes it is appropriate to give this theory brief attention. A plaintiff in an age discrimination suit may also demonstrate an employer's discriminatory intent by submitting proof of disparate impact. *See Geller v. Markham*, 635 F.2d 1027, 1032 (2d Cir.1980). A prima facie case of discriminatory impact may be established by showing that an employer's facially neutral policy or practice has a disparate impact on members within the protected class. *See id.* If the plaintiff succeeds in showing such a disparate impact, then the "employer may defend by showing that the employment practice is justified by business necessity . . . and is related to successful performance of the job for which the practice is used . . . ." *Id.* (citation omitted). Similar to other burden-shifting frameworks, the plaintiff then "must be given an opportunity to show that other selection methods having less discriminatory effects would serve the employer's legitimate interest in competent performance of the job." *Id.*

 In this case, Williams has submitted limited evidence that the salary policy of 1996 had a disparate impact on District Managers who were over 40 years of age. *See* Item 26, Williams, ¶ 22 ("This compensation package . . . was only presented to top senior managers including me."); Item 26, Jones Affidavit, ¶ 11 ("At the time this new compensation program was implemented, there were approximately 45 District Managers nationwide. It is my belief that approximately 12 District Managers were impacted . . . ."); *id.* ¶ 5 (stating that "most of the grand fathered managers were over 40 years of age").

For its part, Dictaphone admits: "There were four other District Sales Managers [in the Commercial Division] who had their salaries grandfathered: Michael Collier-age 49, Richard Mears-age 36, Clyde Eller-age 54 and Bob Davis-age 48." Item 19, ¶ 15. In addition to these four District Managers, it may be inferred from Barry Jones's affidavit that he had his salary grandfathered in 1996 and that he was over 40 years of age. *See* Item 26, Jones, ¶¶ 5, 8–9. Thus, the record can be read to establish that at least five of six District Managers who had their salaries grandfathered were also over 40 years of age.

In viewing the evidence in a light most favorable to Williams, the court finds that, under a theory of disparate impact, Williams has stated a prima facie claim for discrimination on his salary reduction claim.

 Dictaphone responds by stating that it implemented this salary policy because it had just divided a single business division into two divisions. As a result of this restructuring, sales quotas were often reduced by as much as half, and supervisory responsibilities were similarly reduced. Dictaphone insists that these reductions necessitated the corresponding salary reductions. *See* Item 19, ¶¶ 10–13. The court credits this explanation and finds that the decision to reduce the salaries of district managers was made in Dictaphone's legitimate business interests.

Williams has not responded to Dictaphone's proffered legitimate reason by showing that "other selection methods having less discriminatory effects" could have served Dictaphone's "legitimate interest[s]." *Geller*, 635 F.2d at 1032. Williams' silence on this issue owes to the fact that Williams has urged a disparate treatment theory on the salary reduction claim. In light of Williams' silence, the court is left with Dictaphone's explanation of the 1996 salary policy's necessity. As such, Williams fails to state a claim for age discrimination based on the 1996 salary policy.

### III. Failure to Promote Claim

Williams also asserts that Dictaphone discriminated against him on the basis of his age when, in May 1996, it failed to promote him to one of two available Regional Vice President positions. Williams satisfies the first and third elements of a prima facie claim for discrimination: he was within the protected age group and he did not receive a promotion for which he applied. *See supra* Discussion Part I, B.

Dictaphone, however, contends that Williams fails to state a prima facie claim both because he was not qualified for the position of Regional Vice President and because the adverse action did not occur under circumstances giving rise to an inference of discrimination. *See Norton*, 145 F.3d at 118.

### A. *Prima Facie Claim*

#### 1. *Qualifications*

■ Dictaphone first states that Williams was not qualified for either Vice President's position because he was not from the Central or Western Region. *See* Item 19, ¶ 17 (stating that plan was to hire people from two respective regions). Williams counters effectively by stating that Dictaphone did not have a company policy in favor of hiring Vice Presidents who were from the region itself. *See* Item 26, Williams, ¶¶ 66–67. Indeed, Dictaphone initially offered Clyde Eller the position of Western Regional Vice President. At the time of that offer, Mr. Eller was a District Manager in North Carolina and had no connection to the Western Region. *See id.*

Second, Dictaphone states that it did not promote Williams because he had not had any experience in managing a "large" district such as New York City. Item 19, ¶ 20. Williams denies that anyone at Dictaphone ever told him that he would have to be a

District Manager in New York City—or some other comparably large district—in order to become a Regional Vice President. *See* Item 26, Williams, ¶¶ 52–56 (stating that Williams was told that he did *not* have to be a District Manager in a large district before he could become a Regional Vice President). Finally, Williams maintains that several District Managers became Regional Vice Presidents without first working as a District Manager of a large district like New York City. *Id.* ¶¶ 56–58 (contending that George Wallrich, Barbara Bilka, Robert Schwager, and Mark Jamieson became Vice Presidents before managing large districts).[6]

In light of the foregoing, it appears that Williams has satisfied the second element of a prima facie claim for failure to promote in that he was qualified for the position.

#### 2. *Inference of Discrimination*

■ With respect to whether Williams was denied the promotion under circumstances that could give rise to an inference of discrimination, the court simply notes that Williams may satisfy this burden by showing that he was not hired despite his qualifications and that the position was ultimately filled by a person under 40 years of age. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Here, both Jamieson and Van den Heuven were 35 years old at the time that they received the positions over Williams. As such, Williams satisfies the fourth element of a prima facie claim for failure to promote.

### B. Dictaphone's Proffered Reason & Williams' Showing of Pretext

■ Dictaphone insists that it did not hire Williams as a Regional Vice President because it hired two candidates who were

---

6. Dictaphone contends that Williams knew that the New York City position was a necessary "stepping-stone" to becoming a Regional Vice President. *See* Item 17, pp. 4–5. How-

ever, in the context of a motion for summary judgment where Williams is the nonmovant, the court must resolve these questions of fact in Williams' favor.

more qualified than he. Again, Mark Jamieson and Greg Van den Heuven were 35 years old when they were hired as Regional Vice Presidents. Dictaphone maintains that it hired Jamieson for the Central Region because he had worked as a District Manager longer than Williams and because Jamieson had been Dictaphone's number one District Manager for 1995. Item 19, ¶ 18. Williams rebuts Dictaphone's proffered reasons regarding Jamieson because Williams had actually been a District Manager since February 1994, whereas Jamieson had only come on as a District Manager in January 1995.[7] However, Williams does not and cannot dispute that Jamieson was Dictaphone's number one District Manager for 1995. Jamieson's status as Dictaphone's number one District Manager in 1995 represents an unrebutted and legitimate reason for preferring Jamieson over Williams.

As to the Western Region, Dictaphone first offered the position to Clyde Eller, age 53. Item 19, ¶ 19.[8] Mr. Eller declined this offer, and Dictaphone then hired Mr. Van den Heuven on the basis of his superior experience, his past success in the large Phoenix district, and his contacts in the Western Region. *See id.* Williams has not offered any significant evidence to rebut Dictaphone's proffered legitimate reasons for hiring Van den Heuven over him.

In light of Williams' failure to rebut Dictaphone's legitimate reasons for hiring Jamieson and Van den Heuven, Williams fails to carry his preliminary burden of showing that a discriminatory animus motivated the decision not to promote him. *See, e.g., Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996) (holding in context of Title VII action that "[t]he evidence that defendant filled ... positions with ... applicants [from outside of the protected class] who were more qualified than plaintiff rebuts any presumption of discrimination").

## IV. Performance–Related Claims

Williams also claims that Dictaphone retaliated against him by placing him on a "Work Plan for Success" ("Work Plan") in November 1996 and then on a "Performance Improvement Plan" ("Performance Plan") in March 1997. Further, Williams claims that Dictaphone both retaliated and discriminated against him when it fired him in July 1997. The court takes these three claims up together since all of them are intertwined with the issue of whether Williams performed his job adequately from January 1996 through July 1997.

As a threshold matter, the court recognizes that the record supports a finding that Williams was successful as a District Manager from February of 1994 through the end of 1995. *See* Item 33, Exhs. 36–46 (containing documentation regarding Williams' performance). However, it appears that Williams began to have trouble in 1996, at which time Dictaphone restructured its sales force.

### A. *Work Plan Claim and Improvement Plan Claim*

#### 1. *Prima Facie Claim*

Williams alleges that Kamenir retaliated against him after Williams complained to him about the discriminatory nature of the 1996 salary policy and after Williams told Kamenir that he would be retaining an attorney and filing a complaint with the EEOC. *See* Item 26, Williams, ¶ 108. Thus, Williams satisfies the first element of a prima facie case of retaliation because he has shown that he

---

7. While this is true, the court here notes that Dictaphone was apparently arguing on the basis of when Williams became the *permanent* District Manager for Rochester, which was in May 1995. Item 16, ¶ 15. Therefore, Williams' argument *does not demonstrate* pretext so much as it represents a more accurate understanding of when he actually began as District Manager.

8. Dictaphone contends that this fact alone dispels any inference of age discrimination in the promotion process.

engaged in protected activity that was known by Kamenir, the alleged retaliator.[9]

■ In addition, Williams has shown that Kamenir subjected Williams to an adverse employment action, *i.e.*, a sort of enhanced and remedial supervision. *See* Item 33, Exh. 7, pp. 37, 47–50.

■ Finally, Williams has shown that there is a reasonable inference that the protected activity and the adverse employment action were causally related because Williams insists that he presented his complaints to Kamenir in September and October 1996 and that Kamenir placed him on the Work Plan in November 1996. *See DeCintio,* 821 F.2d at 115 ("[A] causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment ....").

### 2. *Dictaphone's Proffered Reason*

■ Kamenir maintains that he placed Williams on the Work Plan and Improvement Plan as a result of Williams' woeful sales figures from April 1996 through October 1996. Indeed, Williams attained only 71 percent of his year-to-date sales quota for the month of April 1996, 23 percent for May 1996, 26 percent for July 1996, 48 percent for August 1996, 21 percent for September 1996, and 59 percent for October 1996. Item 18, Exh. 18; and Item 28, Exh. 1, p. 86.

Thus, by October 1996, Williams' sales figures had been under 80 percent of his year-to-date quota for six straight months. It was Dictaphone's policy to place District Managers on a Work Plan if their sales figures dipped below that 80 percent mark

for six consecutive months. Item 33, Exh. 7, pp. 47–48. As a result, Kamenir developed a Work Plan for Williams on October 30, 1996. *Id.;* Item 18, Exh. 18. As part of this Work Plan, Kamenir provided Williams with guidance on business strategies, management techniques, sales activities, and hiring decisions. In addition, Kamenir visited Williams in Buffalo on a monthly basis and scheduled weekly phone calls to check on Williams' progress. Item 19, ¶ 24 and Item 33, Exh. 7, pp. 100–01, 118–19.

After Williams returned from surgery in late January 1997, Kamenir continued the Work Plan in an effort to assist Williams further. Item 33, Exh. 7, pp. 49–50, 99. By March 1997, Williams' sales figures were still low. As a result, Kamenir placed Williams on a Performance Plan, which was essentially a more intensive version of a Work Plan. *Id.* at 37, 49–50.

### 3. *Showing of Pretext*

Williams does not contest the accuracy of his sales figures as they appear in the record. Similarly, Williams does not contest that Dictaphone had a policy of placing District Managers on Work Plans and Improvement Plans if they failed to attain 80 percent of their quota for six straight months. Finally, Williams neither shows direct evidence of Kamenir's age bias or indirect evidence of that bias (*e.g.,* that Kamenir treated younger District Managers more favorably when it came to Work Plans).[10] In light of this, Williams fails to state a claim for retaliation based on Kamenir's decision to place him on a Work Plan in November 1996 and on an Improvement Plan in March 1997.

---

9. Admittedly, Kamenir steadfastly denies that he was aware of Williams' complaints regarding age discrimination or of the fact that Williams was pursuing legal remedies. *See* Item 33, Exh. 7, pp. 98–99. Yet on a motion for summary judgment, the court must resolve this dispute in favor of Williams.

10. For reasons discussed *infra,* the court rejects Williams' theory that there is evidence of pretext in the fact that Kamenir refused to account for various extenuating circumstances before taking adverse employment actions against Williams. *See infra* Discussion, Part IV, B, 2, c.

**B.** *Discharge as Discriminatory and Retaliatory*

**1.** *Prima facie claim*

a. Firing as discriminatory.

With respect to the claim for discriminatory and retaliatory discharge, Williams satisfies parts one and three of a prima facie claim for discriminatory discharge. *See supra* Discussion, Part I, B. That is, the parties agree that Williams was over 40 when he was fired in July 1997.

Notwithstanding Williams' *de minimis* burden at this stage, though, Williams fails to satisfy the other two prongs of a prima facie claim for discriminatory discharge: first, whether he was qualified for the position when he was fired; and second, whether he was fired under circumstances that might give rise to an inference of discriminatory intent. *See supra* Discussion, Part I, B.

 With respect to qualifications, the record establishes that Williams attained under 50 percent of his sales quota for the year 1996. Further, Williams continued to struggle with his sales figures until as late as May 1997, when he attained only 16 percent of his monthly sales quota. Item 18, Exh. 21.[11]

 In addition, there is little evidence that Williams was fired under circumstances giving rise to an inference of discrimination. Rather, the record indicates that Williams' performance as a District Manager was sub-par from 1996 through 1997. Further, there is no direct evidence that Kamenir harbored an age bias or that he treated Williams any differently than District Managers who were under 40 years old. *See infra* Discussion, Part IV, B, 2, c.

For the purposes of analysis, however, the court will take up a limited discussion of whether Williams has shown that Dictaphone's proffered reasons for firing him are pretextual. *See infra* Discussion, Part IV, B, 2.

b. Firing as retaliatory.

 Williams also satisfies parts one and two of a prima facie claim for retaliatory discharge. That is, one could reasonably find that Williams engaged in protected activity under the ADEA when he complained to Kamenir about Dictaphone's discriminatory policies and notified Kamenir of his intent to file a complaint with the EEOC. *See, e.g., Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989) (recognizing that plaintiff must complain with good faith belief that employer engaged in discriminatory practice or policy). In addition, Dictaphone certainly subjected Williams to an adverse employment action when Kamenir fired him in July 1997. *See supra* Discussion, Part I, C.

 However, Williams fails to satisfy the third element of a prima facie claim for retaliatory discharge, *i.e.*, showing a causal nexus between his protected activity and the adverse employment action. *See supra* Discussion, Part I, C. That is, Williams complained to Kamenir about the salary policy and put Kamenir on notice of his intent to file a complaint with the EEOC in September and October 1996. *See* Item 26, Williams, ¶ 108. Williams then filed his EEOC complaint in November 1996. Item 33, Exh. 1. Yet, Kamenir fired Williams in July 1997—a full eight months after Williams engaged in his protected activity. *See* Item 18, Exh. 3, pp. 98, 121. An eight-month lapse between protected activity and an adverse employment action does *not* suggest a causal relationship between the two events. *See, e.g., Lees v. Case–Hoyt Corp.*, 779 F.Supp. 717, 726

---

11. Williams maintains that he had his region's number one district in March 1997. Item 26, Williams, ¶ 114. Yet, Williams submits no documentary proof to support this assertion. On the other hand, the record reveals that Williams failed to achieve his sales quota for that same month of March 1997, and later attained just 16 percent of his quota for May 1997. *See* Item 18, Exhs. 21 & 23.

(W.D.N.Y.1991) (granting summary judgment to employer and finding no indirect proof of causal nexus where there was seven-month gap between protected activity and adverse employment action).

Notwithstanding Williams' apparent failure to state a prima facie claim for retaliatory discharge, the court will again take up a limited analysis of whether Williams has shown that Dictaphone's proffered reasons for firing him are a mere pretext for retaliatory animus. *See infra* Discussion, Part IV, B, 2.

### 2. *Dictaphone's Proffered Reasons and Williams' Showing of Pretext*

#### a. Communication with Kamenir.

■■■ Kamenir enumerates many instances where Williams failed to communicate with him appropriately. As a general matter, Kamenir believes that Williams inappropriately addressed important issues by calling Kamenir in the evening and leaving messages on his voicemail. *See* Item 33, Exh. 7, p. 90 (stating that Williams constantly "hid behind voicemail"). For his part, Williams denies that he ever failed to communicate with Kamenir appropriately. Williams insists that he followed standard operating procedure at Dictaphone whenever he communicated with Kamenir via voicemail. Item 26, Williams, ¶¶ 80–82, 86.

Kamenir also related an incident in August 1996 where Williams failed to give more than one day's notice of his inability to attend a training session in Philadelphia. *See* Item 18, Exh. 12; and Item 33, Exh. 7, pp. 30–33. Here, Williams maintains that he first told Kamenir in July 1996 that he would probably not attend the training session in August due to ongoing medical problems. *See* Item 26, Williams, ¶¶ 83–85. Williams then met with his doctor in early August and was instructed not to attend the training session. Immediate-

ly thereafter, Williams states that he informed Kamenir that he would not be able to attend. *See id.*

Finally, Kamenir states that Williams took medical leave in December 1996 and completely failed to keep Kamenir up to date on the dates of his sick leave. Kamenir alleges that Williams knew on December 5, 1996, that he was going to have major surgery on December 11, 1996. Yet, Kamenir claims, Williams failed to inform Kamenir of that fact until December 10, 1996. *See* Item 18, Exh. 22.[12] Williams vigorously disputes this version of the facts. First, Williams states that he advised Kamenir in early December 1996 that his surgery was imminent. At that time, Williams told Kamenir that he would advise him of the specific date as soon as it was set. Next, Williams maintains that his doctor confirmed his surgery date on December 6, 1996. Immediately thereafter, Williams called Kamenir and left a message that his surgery would be on December 11. Williams avers that by calling Kamenir on December 6, he gave Kamenir as much advance notice as possible. *See* Item 26, Williams, ¶¶ 87–90.

#### b. Client Relations.

Kamenir's complaints regarding client relations arise from two incidents. The first incident occurred in the fall of 1996 and concerned a Dictaphone customer by the name of Practicare Medical Management ("Practicare"). Practicare accused Dictaphone salesman Scott McKeon of forging the signature of a Practicare employee on a purchase order. Williams was responsible for resolving the situation. Kamenir questioned the way in which Williams handled the dispute and suggested that Williams had covered up for McKeon's fraud. *See* Item 16, ¶¶ 47–48; Item 18, Exh. 14. Williams denies that there was a forgery or a cover-up. Item 26, McKeon Affidavit. Furthermore,

---

**12.** According to Kamenir, this untimely notice made it extremely difficult to prepare for Williams' absence and caused Kamenir to waste money and time on planning a three-day visit with Williams.

Williams insists that the problem with Practicare was resolved to "all parties [sic] satisfaction" once Williams returned from sick leave in early 1997. Item 26, Williams, ¶ 98.

The second incident concerned Williams' alleged failure to handle a billing complaint from a Buffalo law firm. Item 18, Exh. 15. Williams maintains that his failure to timely respond to this customer's complaint was due to the fact that he was out on medical leave at the time that the customer raised the complaint. *See* Item 26, Williams, ¶ 98. In any event, Williams argues that it was clearly Kamenir's responsibility to handle this complaint because Regional Vice Presidents were obligated to act in place of District Managers who were out on leave. *Id.* ¶ 99.

c. Sales figures.

As set forth *supra*, Williams attained only 71 percent of his year-to-date sales quota for the month of April 1996; 23 percent for May; 26 percent for July; 48 percent for August; 21 percent for September; and 59 percent for October. *See* Item 18, Exh. 18; and Item 28, Exh. 1, p. 86. In addition, Williams reached only 74 percent of his year-to-date sales quota as of May 1996. Finally, Williams finished 1996 by reaching only 49 percent of his sales quota for the year. *See* Item 18, Exh. 3, p. 51. After being placed on a Work Plan and Improvement Plan, Williams failed to improve his sales figures significantly. Item 33, Exh. 7, pp. 37, 47–50, 99–101, 118–19. As a result of his continued poor performance, Kamenir contacted Williams by a letter dated March 6, 1997. In that letter, Kamenir set forth Williams' sales figures for November and December 1996, and January and March

1997. In each of those four months, Kamenir reported that Williams was well under quota. *See* Item 18, Exh. 23.

On June 10, 1997, Kamenir sent Williams a letter in which he summarized his review of Williams' progress. Item 18, Exh. 21. In that letter, Kamenir noted that Williams had attained less than 15 percent of his year-to-date quota for May 1997. *Id.*[13] Kamenir warned Williams that he faced imminent discharge if he did not immediately improve his district's performance. By June 1997, Kamenir determined that Williams' sales figures had not improved. As a result, Kamenir fired Williams in July 1997. *See* Item 19, ¶ 26.

Williams insists that there were many factors that led to his low sales figures and that Kamenir was well aware of all of them. According to Williams, these factors were as follows: (1) jury duty from late May until early July of 1996; (2) "back-dated" sales from 1996 that were counted towards the final quarter of 1995; (3) a serious illness that forced Williams to miss many days of work throughout 1996, undergo surgery in December 1996, and take over six weeks of sick leave; and (4) the difficulties associated with 1996 being a "rebuilding" year for Dictaphone—requiring Williams to spend time learning about Dictaphone's new products. *See* Item 26, Williams, ¶¶ 27–32, 64, 70–71, 76a, 111–17, 121–22; Item 33, Exhs. 33 and 48.

In the end, Williams insists that Kamenir's complaints about Williams' communication skills were a mere pretext for age discrimination. Williams also argues that Kamenir's dissatisfaction with his client relations was pretextual because such complaints have no basis in fact. Finally, Williams insists that Kamenir's alleged disappointment with his sales performance

---

**13.** In addition, Kamenir reprimanded Williams for his failure to obtain a laptop computer, to complete certain certification classes, and to hire two Account Executives for his district. *Id.* In addition, Williams insists that there was no basis for Kamenir to reprimand him for his failure to obtain a laptop computer or to hire two Account Executives. See Item 26, Williams, ¶ 116 (claiming that financial constraints prevented him from buying computer and that failure to hire was attributable to Kamenir's failure to approve hirings). These issues seem moot in light of the fact that Williams' sales figures were poor for May and June 1997.

is pretextual since Kamenir unreasonably failed to consider the many extenuating circumstances that affected his performance.

Yet, it is not enough simply for Williams to show that Kamenir's proffered reasons for firing him are arguably false. Rather, Williams must show that Kamenir's proffered reasons are a *pretext for discriminatory animus*. Thus, in order to make a showing of pretext, Williams would need to point to some form of substantial evidence to support a reasonable inference in his favor—either some direct evidence of Kamenir's age bias or indirect evidence of that *bias*—*e.g.*, that Kamenir excused comparable issues for District Managers who were outside of the protected class.

Here, the court notes Williams' reliance on a recent Supreme Court decision. In *Reeves v. Sanderson Plumbing Products, Inc.*, — U.S. —, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court clarified the nature of a plaintiff's ultimate burden in an age discrimination case.[14] Writing for a unanimous court, Justice O'Connor outlined "the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence:"

> [In *St. Mary's Honor Center* ] . . . we reasoned that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Specifically, we stated:
>
> > The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with elements of the prima facie case, suffice to show intentional discrimination.
>
> Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to

conclude that the employer unlawfully discriminated.

*Reeves*, 120 S.Ct. at 2108 (citation omitted).

However, the Court in *Reeves* went on to add that:

> This is not to say that such a showing [of falsity or pretext] by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Id.* In citing to decisions such as *St. Mary's* and *Burdine*, the Court in *Reeves* has reiterated and clarified settled standards of law. In this order and opinion, the court has recognized these same standards of law. *See supra* Discussion, Part I, A.

Further, the court finds that *Reeves* is not factually on point with the present case since there are substantial differences in the quantity and quality of proof presented by the respective plaintiffs. In *Reeves*, the Court found that the plaintiff, as part of his prima facie case, had proffered substantial evidence to support a jury's inference that the proffered reasons were false and that the plaintiff's firing had actually been the result of discriminatory animus. Yet in this case, the court has already found that the evidence supporting Williams' prima facie claims is quite thin. Moreover, Williams has not effectively rebutted Dictaphone's position that he persistently failed to achieve his year-to-date quota. As a result, the court has concluded that Williams has failed to establish prima facie claims of discriminatory and retaliatory firing. *See supra* Discussion, Part IV, B, 1.

---

**14.** Although the Court in *Reeves* was dealing with whether defendant was entitled to judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, this court heeds the language that the Court set forth regarding the appropriate standards of law for age discrimination cases.

In addition, the court also notes here that Williams has submitted no direct evidence of Kamenir's alleged discriminatory age bias. Indeed, at his deposition, Williams stated that he had a conversation with Kamenir in the summer of 1996, in which Kamenir said to him that he "didn't realize [that Williams was] that old." Item 18, Exh. 3, p. 98. Yet this isolated, "stray" remark does not raise an issue of fact regarding Kamenir's age bias. *See Layaou v. Xerox Corp.*, 999 F.Supp. 426, 433 (W.D.N.Y.1998) (holding that allegedly discriminatory remark was non-probative because it was not contemporaneous with the adverse decision and was totally unrelated to the decisional process) (citation and quotation omitted).

Finally, the court finds that Williams' reliance on *Carlton* adds little to this court's analysis. There, the court of appeals seems to anticipate the language of *Reeves* by holding that:

> At [the third stage of the *McDonnell Douglas* burden-shifting framework], the burden shifts back to the plaintiff to offer proof "through presentation of his own case and through cross-examination" that would allow a rational factfinder to conclude that the proffered reason was not the true reason for the adverse employment action, and that age was. To meet this burden, the plaintiff may rely "on the evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action."

*Carlton*, 202 F.3d at 135 (citation omitted). Further, the court finds that *Carlton* differs critically from this case in terms of its facts. In that case, the plaintiff was replaced by a much younger person at a salary of about $10,000 less than what the plaintiff was earning. In this case, there was no replacement for Williams, since his job was in effect abolished by consolidating the Buffalo office with the Cleveland office.

Furthermore, Williams alleges that there was a general culture of age bias at Dictaphone in and around 1996 and 1997. In support of this position, Williams submits proof that Regional Vice Presidents Barbara Bilka and Anthony Procops both stated that Dictaphone was attempting to phase out its older District Managers. *See* Item 18, Exh. 3, pp. 88–89 (Bilka); Item 26, McKeon Aff., ¶ 7 (Procops). In addition to this proof, Williams provides allegations that unnamed senior executives admitted in 1995 and 1996 that Dictaphone planned on getting rid of its senior people. *See* Item 18, Exh. 3, pp. 134–35. By making these allegations, however, Williams does not advance his case. None of the Dictaphone executives who allegedly made these comments to him was involved in the decision to fire him. Rather, it was Kamenir who made that decision. *See* Item 16, ¶ 68 and Item 18, Exh. 3, p. 121. A plaintiff's claim of discrimination is not substantiated where plaintiff submits proof of a discriminatory comment that was made by a person not involved in the adverse decision. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162 (2d Cir.1998) ("stray remarks . . . by persons who are not involved in the decision making process" do not support an inference of impermissible discrimination).

In light of the foregoing analysis, the court finds that Williams has failed to proffer evidence that would allow a reasonable factfinder to infer that either discriminatory or retaliatory intent motivated the decision to fire him in July 1997.

## CONCLUSION

For the reasons stated herein, the court finds that plaintiff Williams has failed to carry his initial burden of showing that he suffered adverse employment actions as a result of discriminatory or retaliatory intent. As such, the court grants defendant Dictaphone's motion for summary judgment (Item 116).

So ordered.